**BILLY J. WILLIAMS, OSB # 901366**
United States Attorney
District of Oregon
**SEAN E. MARTIN, OSB # 054338**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
sean.martin@usdoj.gov
Telephone:  (503) 727-1010
> Attorneys for Defendants Ronald Alvarado and Natural Resources
> Conservation Service

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **MATTHEW JAMES SMITH; PAUL CALLEN, KATHY POWELL, ALLAN D. CLACK, DARREN PARKER, LYNN WARNER, KEVIN CORKERY,** and **ANN CORKERY,**<br><br>            Plaintiffs,<br><br>v.<br><br>**TUMALO IRRIGATION DISTRICT; RONALD ALVARADO; NATURAL RESOURCES CONSERVATION SERVICE,**<br><br>            Defendants. | Case No. 6:20-cv-00345-MK<br><br><br>**RESPONSE OF DEFENDANTS RONALD ALVARADO AND NATURAL RESOURCES CONSERVATION SERVICE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

Table of Authorities ........................................................................ iv

Glossary of Acronyms and Abbreviations............................................x

INTRODUCTION ...........................................................................1

FACTUAL BACKGROUND ..............................................................3

I.   Background on the project area and the existing irrigation system .......3

II.  The Conservation Service's review process for the project under the
     National Environmental Policy Act ...........................................5

III. Plaintiff's properties and their involvement in the NEPA process..........9

IV.  Involvement by other interested parties in the NEPA process............. 11

V.   Proceedings in this action..................................................... 12

LEGAL BACKGROUND ................................................................ 12

I.   The National Environmental Policy Act.................................... 12

II.  Standard of Judicial Review for NEPA claims under the
     Administrative Procedure Act................................................ 14

STANDARD FOR A PRELIMINARY INJUNCTION ................................... 16

ARGUMENT ............................................................................. 17

I.   Significant threshold failings undermine Plaintiffs' arguments
     regarding the merits of their claims ....................................... 17

     A.   Plaintiffs cannot establish a likelihood of success on the
          merits in this APA action based on post-decisional evidence ..... 17

     B.   Six of the eight Plaintiffs do not even allege NEPA claims ........ 19

i

## <u>TABLE OF CONTENTS</u> (cont'd)

C.    Plaintiffs waived most of their claims against Federal
Defendants by not raising them during the NEPA process
and therefore have no likelihood of success on those claims ....... 20

II.    Plaintiffs have no likelihood of success on the merits of their
NEPA claims ........................................................................... 23

A.    Plaintiffs have no likelihood of success on their NEPA-
alternatives claim .......................................................... 23

1.    Legal standards regarding NEPA alternatives ................ 23

2.    The Conservation Service's explanation for eliminating
the farm-efficiency alternatives was neither arbitrary
nor capricious ...................................................... 25

3.    Plaintiffs misrepresent the applicable NEPA law and
otherwise fall short in showing any likelihood of success . 26

B.    Plaintiffs have no likelihood of success on their NEPA
cumulative-effects claim ................................................ 30

1.    Legal standards regarding NEPA cumulative effects ....... 30

2.    The Conservation Service's analysis of cumulative
effects was neither arbitrary no capricious ...................... 31

3.    Plaintiffs fall short in establishing any likelihood of
success ............................................................... 32

C.    Plaintiffs have no likelihood of success on their NEPA
costs-benefits claim ....................................................... 37

1.    Legal standards ................................................... 37

# TABLE OF CONTENTS (cont'd)

2. Plaintiffs fail to establish any likelihood of success on their NEPA costs-benefits claim .......................................... 38

D. Plaintiffs fail to establish any likelihood of success on their NEPA claim that reducing drowning risk was an arbitrary and capricious project need ........................................... 43

E. Plaintiffs fail to establish any likelihood of success on their NEPA recreation-effects claim ....................................... 46

F. Plaintiffs fail to establish any likelihood of success on the merits of a brand-new non-NEPA claim ........................................ 48

III. Plaintiffs fail to establish a likelihood of irreparable harm ................. 50

A. Legal background ........................................................... 50

B. Plaintiffs fail to meet their burden of establishing immediate irreparable harm ........................................................... 51

IV. The balance of equities/hardships does not favor a preliminary injunction ........................................................................ 54

V. A preliminary injunction is not in the public interest ........................... 57

VI. Plaintiffs' requested injunction is not narrowly tailored and could prejudice other property owners who are not before this Court .......... 60

VII. Plaintiffs should be required to post an appropriate bond for any injunction ........................................................................ 61

CONCLUSION ................................................................. 62

CERTIFICATE OF COMPLIANCE ................................................. 63

## **TABLE OF AUTHORITIES**

**Cases**

*Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073 (9th Cir. 2013) ........ 44

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............... 17

*All. for the Wild Rockies v. Pena*, 865 F.3d 1211 (9th Cir. 2017) ................... 17

*Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794 (9th Cir. 1980) ......................... 18

*Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ................................... 30

*Burkey v. Ellis*, 583 F. Supp. 897 (N.D. Ala. 1979) ......................................... 38

*California by and through Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (en banc) ................................................................................................................. 16

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584 (9th Cir. 2018) ................................................. 40, 41, 42

*Caribbean Marine Serv. Co., Inc. v. Balrige*, 844 F.2d 668 (9th Cir. 1988).... 50

*City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).......... 60

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ............................. 14

*Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-CL, 2017 WL 5957811 (D. Or. Jan. 18, 2017) ............. 18, 19

*Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency*, 90 F. Supp. 3d 1177 (W.D. Wash. 2015).................................................. 18-19

*Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011) ....................................................................... 15

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ................................ 14, 21

*Dickinson v. Zurko*, 527 U.S. 150 (1999) .................................................*passim*

*Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010 (9th Cir. 2012) .......... 27

*Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125 (9th Cir. 2010) ... 16

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985).............................. 18

*Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089 (9th Cir. 2003) ........... 15

*Great Basin Mine Watch v. Hankins*, 456 F.3d. 955 (9th Cir. 2006) ............. 22

*Greater Hells Canyon Council v. Stein*, No. 2:17-cv-00843-SU,
   2018 WL 3966289 (D. Or. June 11, 2018), *aff'd*, 796 Fed. App'x
   396 (9th Cir. Jan. 9, 2020) ........................................................................... 18

*Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143 (9th Cir. 2010) ............... 13

*Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011)........... 18

*Headwaters, Inc. v. Bureau of Land Mgmt.*,
   665 F. Supp. 873 (D. Or. 1987) ................................................................... 54

*Idaho Sporting Congress v. Alexander*, 222 F.3d 562 (9th Cir. 2000)........ 27-28

*Inland Empire Pub. Lands Council v. Schultz*,
   992 F.2d 977 (9th Cir. 1993) ....................................................................... 35

*Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006) ................. 15

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ..................................................... 30

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
   634 F.2d 1197 (9th Cir. 1980) ..................................................................... 51

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc) ................ 14

*League of Wilderness Defs.-Blue Mountain Biodiversity Project v.
   Bosworth*, 383 F. Supp. 2d 1285 (D. Or. 2005)............................................ 33

## TABLE OF AUTHORITIES (cont'd)

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v.
    U.S. Forest Serv.*, 549 F.3d 1211 (9th Cir. 2008) .......................................... 31

*League of Wilderness Defs.—Blue Mountains Biodiversity Project v.
    U.S. Forest Serv.*, 689 F.3d 1060 (9th Cir. 2012) .......................................... 24

*Lydo Enter., Inc. v. Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) ........................ 54

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989) ................................ 43

*Monjaraz–Munoz v. I.N.S.*, 327 F.3d 892 (9th Cir. 2003)................................. 44

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........................... 50

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,
    Inc.*, 463 U.S. 29 (1983) .....................................................................*passim*

*Munaf v. Geren*, 553 U.S. 674 (2008) ............................................................... 16

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.,*
    545 F.3d 1147 (9th Cir. 2008) .................................................................. 24, 27

*Nat. Res. Def. Council v. Winter*, 555 U.S. 7 (2008) .................................*passim*

*Native Ecosystems Council v. U.S. Forest Serv.,*
    428 F.3d 1233 (9th Cir. 2005) ........................................................................ 24

*Native Ecosystems Council v. Weldon*, 697 F.3d. 1043 (9th Cir. 2012)..... 14, 40

*Nat'l Parks and Conservation Ass'n v. U.S. Dep't of Transp.,*
    222 F.3d 677 (9th Cir. 2000) .......................................................................... 47

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir.
    1998).................................................................................................................. 30

*Nevada Land Action Ass'n v. U.S. Forest Serv.,*
    8 F.3d 713 (9th Cir. 1993) ................................................................... 37-38, 39

# TABLE OF AUTHORITIES (cont'd)

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985) ........................................ 54

*ONDA v. Sabo*, 854 F. Supp. 2d 889 (D. Or. 2012) ......................................... 50

*Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016)............. 21, 22

*Port of Astoria v. Hodel*, 595 F.2d 467 (9th Cir. 1979).................................... 38

*Portland Audubon Soc. v. Endangered Species Comm.*,
   984 F.2d 1534 (9th Cir. 1993) ........................................ 15

*Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153 (9th Cir. 1998) ........... 23

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004) .................................. 60

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).... 12, 13, 28

*Sampson v. Murray*, 415 U.S. 61 (1974)........................................................... 51

*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161 (9th Cir. 2011) ................... 50

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   100 F.3d 1443 (9th Cir. 1996) ........................................ 18

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
671 F.3d 1113 (9th Cir. 2012)........................................ 13, 17, 18, 19

*Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir. 1974) ............................. 37

*Umpqua Watersheds v. U.S. Forest Serv.*, 725 F. Supp. 2d 1232
(D. Or. 2010)........................................................................ 30

# TABLE OF AUTHORITIES (cont'd)

*Univ. of Haw. Prof'l Assembly v. Cayetano*,
   183 F.3d 1096 (9th Cir. 1999) ........................................................ 54

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ...................................................................... 21

*Wild Wilderness v. Allen*, 871 F.3d 719 (9th Cir. 2017) ............................ 38, 44

*WildEarth Guardians v. Provencio*, 923 F.3d 655 (9th Cir. 2019) ................. 47

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983) .................................................. 60

## Statutes

5 U.S.C. § 704 ............................................................................................ 9
5 U.S.C. § 706 ............................................................................................ 15
5 U.S.C. § 706(2)(A) .................................................................................. 15
16 U.S.C. § 1000 ........................................................................................ 5
16 U.S.C. § 1001 .................................................................................... 5, 56
16 U.S.C. § 1002 ........................................................................................ 26
16 U.S.C. § 1005(1) .................................................................................... 8
42 U.S.C. § 4332(C) .................................................................................. 13

## Rules

Fed. R. Civ. P. 65(c) .................................................................................. 61

## Regulations

7 C.F.R. § 622.11(a)(6) ........................................................................ 48, 49
7 C.F.R. § 622.11(b)(3) .............................................................................. 9
40 C.F.R. § 1501.4(e) ................................................................................ 14
40 C.F.R. § 1502.1 .................................................................................... 36
40 C.F.R. § 1502.13 .................................................................................. 27
40 C.F.R. § 1502.14 .................................................................................. 27
40 C.F.R. § 1502.14(a) .............................................................................. 24

## TABLE OF AUTHORITIES (cont'd)

40 C.F.R. § 1502.16 ........................................................................... 36

40 C.F.R. § 1502.23 ........................................................................... 37

40 C.F.R. § 1508.9 ...................................................................... 13, 24

40 C.F.R. § 1508.9(a)(1) ..................................................................... 13

40 C.F.R. § 1508.9(b) ................................................... 13, 30, 43, 46

40 C.F.R. § 1508.13 ........................................................................... 14

## <u>GLOSSARY OF ACRONYMS AND ABBREVIATIONS</u>

| | |
|---|---|
| APA | Administrative Procedure Act |
| cfs | cubic feet per second |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| HDPE | High-Density Polyethylene |
| NED | National Economic Development |
| NEPA | National Environmental Policy Act |
| Watershed Protection Act | Watershed Protection and Flood Prevention Act, Public Law 83-566 |

Defendants Ronald Alvarado and the Natural Resources Conservation Service (collectively, "Federal Defendants") respond in opposition to Plaintiffs' motion for preliminary injunction.[1]

## INTRODUCTION

Irrigation-channel seepage is providing Plaintiffs an unintended windfall at the expense of other water users, downstream natural habitat, and imperiled species.  To keep their windfall, Plaintiffs seek extraordinary equity in attempting to halt implementation of the Tumalo Irrigation District Irrigation Modernization Project ("the project") in the Allen lateral area. ECF 28, Pls.' Mot. 1-2. The project is a federally-assisted measure co-sponsored by the Tumalo Irrigation District ("the Irrigation District") and the Deschutes Basin Board of Control.

In its environmental review of the project, the Natural Resources Conservation Service ("Conservation Service") found that enclosing and piping existing open irrigation waterways would meet several important needs.  It would eliminate significant seepage water loss in the Irrigation District's system and confer a corresponding benefit on instream flow in the Deschutes Basin that will benefit fish and aquatic habitat.  Further, it would

---

[1]  Plaintiffs have withdrawn their motion for a temporary restraining order.

Response to Plaintiffs' Motion for Preliminary Injunction; *Smith, et al v. Tumalo Irrigation District, et al*, Case No. 6:20-cv-00345-MK

improve water delivery and operations and eliminate any risk from drowning in these open irrigation waterways.

In August 2018, the Conservation Service made its final agency decision to implement the enclosing-and-piping project alternative. The State of Oregon has endorsed this approach and the State's Water Resources Department has identified the project's Allen lateral phase as its # 1 recommendation for 2020 grant funding because of its high public benefit.

Plaintiffs own properties that are burdened by the Irrigation District's easements and rights-of-way. They oppose this project as it will remove the open, artificial irrigation waterways that—as an unintended benefit—maximize their private properties' value. Plaintiffs complain that the project will destroy vegetation and other resources that have been created by unintended irrigation seepage. But Plaintiffs are asserting nonexistent water rights, and the artificial-channel seepage is benefiting Plaintiffs at the expense of other water users, downstream natural habitat, and imperiled species. Plaintiffs, moreover, do not want to spend their own resources to maintain vegetation on their property.

Plaintiffs' request for extraordinary equity should be denied, because they establish no likelihood of success on any of their claims against Federal Defendants. Further, Plaintiffs show no likelihood of irreparable harm; they

show only supposed economic harm but they may seek redress on that
through their damages claims against the Irrigation District.  Nor do the
hardships or the public interest favor Plaintiffs.  Finally, Plaintiffs request
an overboard injunction, and should be required to post an appropriate bond
for any injunction.

## FACTUAL BACKGROUND

### I.    Background on the project area and the existing irrigation system.

The project occurs within the Upper Deschutes watershed in central
Oregon, northwest of the City of Bend.  Declaration of Gary Diridoni
("Diridoni Decl."), Exh. A at 30.  The project would serve hundreds of
Irrigation District patrons and more than 7,000 acres that are currently
irrigated within the Irrigation District's service area of about 28,000 acres.
*Id.*  It would modernize the existing irrigation infrastructure by enclosing
and piping up to 1.9 miles of the Irrigation District's canals and 66.9 miles of
its laterals (feeder canals).  *Id.* at 116, 118.

The current irrigation infrastructure is antiquated and inefficient.  *Id.*
at 28, 47-48.  About 30%, or 48 cubic feet per second ("cfs"), of the water
diverted through the Irrigation District's waterways seeps from the open,
unlined irrigation canals and laterals into the area's soils or evaporates prior

to reaching farms. *Id*. at 28, 36. More water therefore must be diverted than needed by farms to account for the loss in the distribution system. *Id*. at 31.

At the same time, the Deschutes River and its tributaries suffer low streamflows each year due to the storage and diversion of water for agricultural use. *Id*. at 37. Low streamflows limit habitat for federally-listed species such as the Oregon spotted frog. *Id*. With less irrigation seepage and evaporation, less water would need to be diverted and more water could stay instream to benefit sensitive species and other critical resources. *Id*. at 36.

The Irrigation District's canals and laterals are not naturally formed waterways. *Id*. at 80. They do not carry water and are typically dry from mid-October through March. *Id*. They do not meet the functional criteria of wetlands, nor are they regulated as wetlands. *Id*. at 98. Generally, the wildlife present in the project area consists of "habitat generalists or edge species with the ability to adapt or exploit the urban environment." *Id*. at 99. These species include deer, coyote, and skunk. *Id*.

There are no federally-listed species in the project area, *id*. at 102, other than those that would be beneficially affected by the project. *Id*. at 136, 137. There are no state-listed terrestrial species known to occur within the project area, and no state-listed aquatic species known to occur in the irrigation canals or other areas at issue. *Id*. at 52, 102.

The existing irrigation infrastructure of open canals and laterals poses a public-safety risk during irrigation season; several drowning deaths have occurred in neighboring irrigation-system canals. *Id*. at 38. This risk is expected to increase as Deschutes County continues strong population growth and urbanization expand into previously rural areas including the Irrigation District's service area. *Id*.

The Watershed Protection and Flood Prevention Act, Pub. Law 83-566, 16 U.S.C. § 1000 *et seq*., authorizes the Conservation Service to provide technical and financial assistance to state and local watershed project sponsors. Diridoni Decl. Exh. F at 1. The underlying policy of the Watershed Protection Act is that the federal government should cooperate with states and entities including irrigation districts to further the conservation and utilization of water, the improvement of water resources, and the quality of the environment. 16 U.S.C. § 1001.

## II. The Conservation Service's review process for the project under the National Environmental Policy Act.

The National Environmental Policy Act ("NEPA") review process for this project began in June 2017 when the Conservation Service circulated a public notice describing the proposed project. Diridoni Decl. Exh. A at 189, 190; *id*. Exh. F at 5. A public meeting was held in early July 2017, *id*. Exh. A at 41, and an initial public comment period occurred in June-July 2017. *Id*.

In April 2018, the Conservation Service published a draft Environmental Assessment ("EA") under NEPA. *Id*. at 196. During a 30-day public comment period, the agency hosted a public outreach meeting. *Id*. After reviewing and responding to the public comments on the draft EA, in August 2018 the Conservation Service published the final EA for the project.

As the final EA emphasized, the project's purposes are to improve water conservation, water delivery reliability, and public safety on 68.8 miles of Irrigation District-owned canals and laterals. *Id*. at 36. The Conservation Service identified four watershed problems and resource concerns where action is needed. *Id*. at 36-38. First, about 48 cfs is lost to seepage and evaporation from the antiquated irrigation infrastructure. EA 9. Second, there are water delivery and operations inefficiencies associated with the current open canal-and-lateral network. *Id*. at 36-37. Third, the Deschutes River and its tributaries experience low streamflows every year due to the storage and diversion of water for agricultural use, which limits habitat for federally-protected species including the Oregon spotted frog. *Id*. at 37-38. Fourth, open canals pose a risk to public safety during the irrigation season; several drowning deaths have occurred in adjacent districts' canals. *Id*. at 38.

In evaluating project alternatives, the Conservation Service studied in detail a no-action alternative and two action alternatives. *Id*. at 110-30. One

of the action alternative, the canal lining alternative, would line the existing open canals and laterals with an impervious system. *Id.* at 111-12.

The other action alternative, the HDPE alternative, would replace the open canals and laterals with an enclosed High-Density Polyethylene ("HDPE") pressurized pipeline system. *Id.* at 116-18. The HDPE alternative would eliminate water loss from seepage and evaporation, increase water delivery reliability to farms, reduce operation and maintenance costs, and reduce patron pumping costs by $325,000/year and reduce carbon emissions by about 2,300 metric tons/year. *Id.* at 117. It would also enhance streamflow and habitat conditions for fish and aquatic species by creating instream water rights through the State of Oregon's Allocation of Conserved Water Program. The Irrigation District would formally allocate and legally protect 100% of the conserved water instream. *Id.* at 117-18. Further, the HDPE alternative would eliminate the risk of drowning by converting the open waterways to buried pipe. *Id.* at 118.

The Conservation Service also documented its consideration of nine additional alternatives that were eliminated from detailed study. *Id.* at 104-09.

For the no-action alternative and the two action alternatives, the 208-page EA addressed the effects of the project on a host of resources including

cultural, fish and aquatic, geology and soils, land use, public safety, recreation, socioeconomic resources, vegetation, water resources, wetlands/riparian areas, wildlife, and wild and scenic rivers.  *Id*. at 131-88.

The EA acknowledged that the HDPE alternative would cut the seepage water currently available to riparian vegetation found along the irrigation canals and laterals.  *Id*. at 175.  However, the EA found that these effects, and effects to wetland-type habitat, would be offset by the benefits to natural downstream riparian areas through instream water right transfers and the reduction of diverted water.  *Id*.  The EA also acknowledged that the HDPE alternative would adversely affect existing terrestrial wildlife habitat, but that would be mitigated by other factors.  *Id*. at 178-79.  Meanwhile, the HDPE alternative would have minor, beneficial effects to federally-listed fish and aquatic species.  *Id*. at 137.

Along with the EA, the Conservation Service published a summary of the public comments it received on the April 2018 draft EA, along with agency responses.  *Id*. Exh. B.  The agency also published various color maps of the project area.  *Id*. Exh. C.

Distinct from NEPA, the Watershed Protection and Flood Prevention Act requires that in a federally-supported project the government determine that the "benefits exceed the costs."  16 U.S.C. § 1005(1).  The works and

improvements in such a project must have "the greatest net national economic benefits consistent with protecting the Nation's environment (for structural water resource projects) relative to alternative works." 7 C.F.R. § 622.11(b)(3).  Given this Watershed Protection Act mandate, the Conservation Service prepared a National Economic Development ("NED") analysis that accompanied the EA.  Diridoni Decl. Exh. D.

The Conservation Service also published tables showing how it quantified effects as a result of the proposal and supporting information and calculations the agency used in addressing resource effects.  *Id*. Exh. E.

After the EA was published, the NEPA process culminated when the Conservation Service's State Conservationist Ronald Alvarado signed a Finding of No Significant Impact ("FONSI") and decided to implement the HDPE alternative.  *Id*. Exh. F.  The FONSI found that the HDPE alternative best met the project's purpose and need under NEPA "while maximizing net economic benefits."  *Id*. at 6.  Under the Administrative Procedure Act ("APA"), the FONSI constituted "final agency action" subject to judicial review.  5 U.S.C. § 704.

## III.  Plaintiffs' properties and their involvement in the NEPA process.

Plaintiffs acknowledge that the Irrigation District has rights-of-way and easements through their properties.  ECF 23, First Amended Complaint

¶ 8.  Plaintiffs also admit their properties are "encumbered by" the Irrigation District's rights-of-way.  *Id*. ¶ 4.  As Plaintiffs note, the Irrigation District acquired these rights-of-way by federal grant under the Carey Desert Land Act of 1894 as part of the Act's purpose to reclaim "arid lands and convert[] them into cultivatable tracts."  *Id*. ¶ 11.

Of the eight Plaintiffs to this action, only two—Matthew Smith and Paul Callen—participated in the NEPA process.  Diridoni Decl. ¶ 14.  Only Smith and Callen allege any NEPA claims against Federal Defendants; the other Plaintiffs do not allege any NEPA violations.  *See* ECF 23.  Smith does not have property in the Allen lateral area at issue in the present motion. *See* Diridoni Decl. ¶ 15.

Smith and Callen's NEPA public comments were limited.  According to the Conservation Service's administrative files for this project, Callen's July 2017 public comments stated his concern that "I don't have a way to protect or preserve MY property from people who think they know what's best for me or everyone else for that matter."  Diridoni Decl. Exh. G at 1.  He emphasized, "if you're concerned about drowning in an irrigation ditch, you don't belong in Central Oregon."  *Id*. at 2.  In May 2018, Callen also commented on the draft EA.  *Id*. at 3.  He voiced his opposition to an "underhanded and deceitful" process and about "irreparable damage to our

property as well as loss of property value and a declining water table for our ground water." *Id*.

In May 2018, Smith commented on the draft EA. *Id*. at 4-6. He raised specific issues including that: 1) the draft EA wrongly dismissed the alternative of requiring water users to be more efficient and responsible with their water use, in lieu of an engineering project; 2) the draft EA unduly emphasized the risk of drowning as a project need when that risk is an "imaginary danger[]"; 3) the draft EA made only "passing reference to landowners' interests." *Id*.

## IV.   Involvement by other interested parties in the NEPA process.

During the NEPA process, the Conservation Service also received comments from the Office of the Oregon Governor. The Governor's Office stated its support for the project, noting the "need to prioritize, develop, and implement investments in water conservation that support instream, municipal and agricultural uses." *Id*. Exh. H at 1. The project, according to the Governor's Office, is "an investment" that "moves this priority forward." *Id*.

The U.S. Fish and Wildlife Service told the Conservation Service that the project was "wholly beneficial" to the federally-protected Oregon spotted

frog and that there will be a "long-term beneficial effect" to spotted frog habitat because flows will be increased over time. *Id*. Exh. J at 3.

## V.    Proceedings in this action.

On March 3, 2020, Plaintiffs filed this action. ECF 1. On June 23, 2020, this Court granted Federal Defendants' motion to dismiss Plaintiffs' second and third claims against them. ECF 15, 18. On August 12, 2020, Plaintiffs filed an amended complaint. ECF 23. On August 26, 2020, Federal Defendants answered. ECF 24.

On September 18, 2020, Plaintiffs moved for a preliminary injunction against all Defendants, to bar commencement of construction and tree cutting in and along the Group 3 Allen lateral. ECF 28. The Allen lateral area is in project group 3 for this project. *See* Diridoni Decl. Exh. C at 18 (map showing Allen lateral are in dark blue).

## LEGAL BACKGROUND

## I.    The National Environmental Policy Act.

The purpose of the National Environmental Policy Act ("NEPA") is twofold: (1) to ensure that agencies carefully consider information about significant environmental impacts in proposing actions, and; (2) to guarantee relevant information is available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA is a procedural statute and "does not require particular environmental standards or mandate that agencies achieve substantive environmental results." *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1150 (9th Cir. 2010). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351.

If an agency determines that a proposed action may significantly affect the quality of the human environment, NEPA generally requires that it prepare an EIS. 42 U.S.C. § 4332(C). The agency may proceed with an EA, when it has not determined an EIS is needed. 40 C.F.R. § 1508.9.[2]

An EA is a "workable public document that *briefly* provides evidence and analysis for an agency's finding regarding an environmental impact." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129 (9th Cir. 2012) (citing 40 C.F.R. § 1508.9) (emphasis in original). An EA is "a concise public document . . . that serves to [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (emphasis added). An EA will contain a "brief" discussion of environmental effects. 40 C.F.R. § 1508.9(b).

---

[2] The NEPA regulations were revised effective September 2020. All of Federal Defendants' citations to the NEPA regulations are to the prior version of the regulations, which apply to the Conservation Service's NEPA review that concluded in August 2018. Plaintiffs' preliminary injunction memo also cites the prior version of the regulations.

If an agency determines that an EIS is not required after preparing an EA, then the agency issues a FONSI. The FONSI briefly states the reasons why the proposed agency action will not have a significant impact on the human environment. 40 C.F.R. §§ 1501.4(e), 1508.13. *See generally Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-58 (2004).

Courts are generally "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council v. Weldon*, 697 F.3d. 1043, 1051 (9th Cir. 2012) (internal quotation omitted).

## II.    Standard of Judicial Review for NEPA claims under the Administrative Procedure Act.

NEPA does not contain provisions for judicial review, so Plaintiffs must raise NEPA claims under the Administrative Procedure Act ("APA"). *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004).

Review of the merits of NEPA claims in preliminary injunction proceedings "necessarily incorporates" the APA's "arbitrary and capricious standard." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *overruled on other grounds by Nat. Res. Def. Council v. Winter*, 555 U.S. 7 (2008).

Under the APA, a court will uphold agency action unless it finds it was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law.'" *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1005 (9th Cir. 2011), *quoting* 5 U.S.C. § 706(2)(A). This standard is "'highly deferential, presuming the agency action to be valid.'" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (internal quotation omitted). "An agency's actions need not be perfect; [courts] may only set aside decisions that have no basis in fact, and not those with which [courts] disagree." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003).

An agency action is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., Inc.*, 463 U.S. 29, 43 (1983).

In assessing a challenged agency decision, the court must "review the whole record" under the APA, 5 U.S.C. § 706, which includes "everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).

An agency action meets APA standards when the agency "relied on its own predictions" within its area of discretion and expertise." *California by and through Becerra v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (en banc) (internal quotation omitted).  Further, "[c]omplete factual support" for an agency's prediction is not "possible or required," and opposing predictions and assumptions are simply evidence for the agency to consider.  *Id.* (internal quotation omitted).

An agency's factual conclusions in APA review are reviewed for "substantial evidence," a standard that is more deferential than the "clearly erroneous" standard for appellate review of trial court findings.  *Dickinson v. Zurko*, 527 U.S. 150, 162, 164 (1999); *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1133-34 (9th Cir. 2010).

## STANDARD FOR A PRELIMINARY INJUNCTION

A preliminary injunction is an "extraordinary and drastic remedy" that is never awarded as of right.  *Munaf v. Geren*, 553 U.S. 674, 688–90 (2008) (citations and quotation omitted).  The party seeking a preliminary injunction "must establish" that it is likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

When there are "serious questions going to the merits," a court may still issue a preliminary injunction when "the balance of hardships tips sharply in the plaintiff's favor," and the other two factors are met.  *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## ARGUMENT

### I.    Significant threshold failings undermine Plaintiffs' arguments regarding the merits of their claims.

#### A.    Plaintiffs cannot establish a likelihood of success on the merits in this APA action based on post-decisional evidence.

Plaintiffs cannot establish a likelihood of success on the merits, because their merits arguments rely heavily on expert litigation declarations created *two years or more after* the Conservation Service's challenged August 2018 decision.  *See* ECF 31, 32, 33 (Plaintiffs' expert declarations signed in August and September 2020).  Established APA law is clear that Plaintiffs' post-decisional information has no appropriate bearing in review of the merits of the Conservation Service's August 2018 decision.

Ninth Circuit precedent bars the use of post-decisional evidence in considering the merits of APA claims.  *See*, *e.g.*, *Tri-Valley*, 671 F.3d at 1130-31.  As *Tri-Valley* recognized in the NEPA context, post-decision information may not be used for judicial review of the merits of a plaintiff's APA claims.

*Id.* Prior Ninth Circuit buttresses this recognition. Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the Agency's decision." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811–12 (9th Cir. 1980). *See also Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) ("Post-decision declarations offered to either justify or attack an agency decision already made should not be considered."). Under the APA, the scope of judicial review is limited to the administrative record available to the agency at the time of the challenged decision. *See Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1024 n.2 (9th Cir. 2011) ("Under the APA, we may consider only the record that was before the agency at the time the challenged decision was made."); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

In reviewing the merits of NEPA claims under the APA, this Court has repeatedly applied these standards in striking post-decisional materials in reviewing challenges to agency decisions. *See*, *e.g.*, *Greater Hells Canyon Council v. Stein*, No. 2:17-cv-00843-SU, 2018 WL 3966289, at *4-6 (D. Or. June 11, 2018), *aff'd*, 796 Fed. App'x 396 (9th Cir. Jan. 9, 2020) (memorandum disposition); *Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-CL, 2017 WL 5957811, at *1 (D. Or. Jan. 18, 2017). *See also Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency*, 90 F. Supp.

3d 1177, 1198 (W.D. Wash. 2015) (rejecting "post-decision evidence" in reviewing the merits of claims brought under APA, as agency decisions "must not be judged with hindsight").

Here, Plaintiff's litigation expert declarations were prepared well after completion of the August 2018 decision they challenge. Their declarations plainly post-date and are necessarily outside of the agency's administrative record. As this Court recognizes in the NEPA/APA context, "the Ninth Circuit applies a post-decisional bar to extra-record materials." *Concerned Friends*, 2017 WL 5957811, at *1 (citing *Tri-Valley*, 671 F.3d at 1130-31). This Court therefore must disregard Plaintiffs' expert declarations (ECF 31 through 33) in considering the merits of Plaintiffs' APA claims.

### B.    Six of the eight Plaintiffs do not even allege NEPA claims.

Most of the Plaintiffs have no likelihood of success on the merits of their NEPA claims, because six of the eight Plaintiffs do not allege these claims.

There are eight Plaintiffs to this action, but only Plaintiffs Smith and Callen allege NEPA claims against Federal Defendants. *See* ECF 23, First Am. Compl. 1, 5, and Prayer for Relief 1. None of the six other Plaintiffs participated in the public NEPA process that culminated in the Conservation Service's August 2018 decision. Diridoni Decl. ¶ 14. Therefore, for six of the

eight Plaintiffs, there can be no likelihood of success on the merits of the

NEPA/APA claims, because those Plaintiffs do not allege those claims in the

first place.[3]

**C.    Plaintiffs waived most of their claims against Federal Defendants by not raising them during the NEPA process and therefore have no likelihood of success on those claims.**

Plaintiffs Smith and Callen assert various claims against Federal

Defendants but fail to establish that they raised these issues during the

NEPA process that culminated in August 2018.  The Conservation Service

has searched its project files, and found that Smith and Callen provided

comments during the NEPA process.  *See* Diridoni Dec. ¶ 10 & Exh. G. But

these comments did not raise any concerns regarding the cumulative effects

of the project in light of other irrigation-modernization projects (or

otherwise), the project's risks-benefits analysis, the project's effects on

recreation, or the project's supposed ineligibility for federal funding.[4]

---

[3] Of the two Plaintiffs who allege NEPA claims, only Callen has property within the Allen lateral area where Plaintiffs seek extraordinary equity against project implementation.  Diridoni Decl. ¶ 15.  Plaintiff Smith has property unaffected by the project implementation at issue in these injunction proceedings.

[4] Federal Defendants do not assert waiver or forfeiture regarding Smith's NEPA alternatives claim, given Smith's comments regarding the on-farm efficiency alternative.  Smith, however, does not live on the Allen lateral, and his property is not at issue with the injunction Plaintiffs seek.  Federal

Smith and Callen's failure to raise these issues during the NEPA process shows those issues are waived and forfeited and Plaintiffs have no likelihood of success on the merits on those claims.  The Supreme Court has made it clear that "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . .  alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) (alterations in original)).

When a particular issue is not presented to an agency during the appropriate comment period in the NEPA process, the issue is waived from later litigation.  *Pub. Citizen*, 541 U.S. at 764-65 (holding that because NEPA litigants "did not raise these particular objections" to the agency, the agency "was not given the opportunity to examine" the objections, and the litigants "forfeited" the objections).

With regard to NEPA challenges, it is Ninth Circuit law that "substantively distinct" issues must be clearly aired before an agency to be exhausted and to avoid waiver in later federal litigation.  *Oregon Nat. Desert*

---

Defendants also do not assert waiver or forfeiture regarding Smith and Callen's challenge to the public-safety need for the project under NEPA, as their public comments raised that issue.

*Ass'n v. Jewell*, 840 F.3d 562, 571-74 (9th Cir. 2016).   In *Jewell*, an

environmental group made "otherwise extremely comprehensive" comments

on an agency's draft NEPA document, but did not make "specific arguments"

about a particular issue and therefore did not put a federal agency "on notice"

that that particular issue was a concern.  *Id*. at 571-72.  The issue therefore

was not subject to judicial review.  *Id*. at 574.  *See also Great Basin Mine*

*Watch v. Hankins*, 456 F.3d. 955, 967 (9th Cir. 2006) (holding in a NEPA case

that a plaintiff's claim was waived when "general comments about

groundwater, springs, and seeps" in administrative proceedings failed to

suggest their later litigation claim that an agency failed to protect water

rights under a particular executive order).

Under *Jewell*, Plaintiffs failed to put the Conservation Service on notice

regarding particular issues, including the cumulative effects of the project in

light of other irrigation-modernization projects (or otherwise), the project's

risks-benefits analysis, the project's effects on recreation, or the project's

supposed ineligibility for federal funding.  Plaintiffs also waived litigation of

these issues under *Public Citizen*.

Plaintiffs had ample opportunity to formulate objections and bring

specific issues to the attention of the Conservation Service: the agency not

only solicited public comments on the draft EA but held two public meetings

on the project including an initial project scoping meeting in July 2017 and a meeting on the draft EA in May 2018.  Further, Plaintiffs did submit comments but chose not to raise many of the issues that now fuel their request for extraordinary equity.

For all these reasons, Plaintiffs have no likelihood of success on the merits against Federal Defendants, and this Court should deny Plaintiffs' motion for preliminary injunction.

## II.    Plaintiffs have no likelihood of success on the merits of their NEPA claims.

Aside from the above threshold problems, Plaintiffs fail to establish a likelihood of success on any of their NEPA claims, as Defendants explain below.

### A.    Plaintiffs have no likelihood of success on their NEPA-alternatives claim.

#### 1.    Legal standards regarding NEPA alternatives.

This Court reviews an agency's "range of [NEPA] alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998).  The scope of the analysis of alternatives depends on the underlying purpose, so the agency need only evaluate alternatives that are reasonably related to the purposes of

the action. *League of Wilderness Defs.—Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012).

The Ninth Circuit recognizes that a less rigorous alternatives analysis applies to an EA as opposed to an EIS.  An agency's "obligation to consider alternatives under an EA is a lesser one than under an EIS." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008).  Under the applicable NEPA regulation, the Conservation Service must only include "a brief discussion[ ] . . . of alternatives" in an EA, which is "a concise public document."  40 C.F.R. § 1508.9.

In the context of an EA, the Ninth Circuit has held repeatedly that a government agency met its NEPA obligations to consider alternatives when it considered in detail two alternatives in an EA:  a no-action alternative and a preferred alternative.  *See*, *e.g.*, *N. Idaho*, 545 F.3d at 1154; *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) (rejecting a NEPA challenge when an EA considered in detail a single action alternative and discussed four additional action alternatives without detailed review).

There is no NEPA regulation specifying that an EA must discuss the reasons it eliminated any alternatives from detailed study.  That provision only applies with an EIS.  40 C.F.R. § 1502.14(a).  The Ninth Circuit

specifies, for its part, that an EA provide simply "an appropriate explanation" for "why an alternative was eliminated." *Native Ecosystems*, 428 F.3d at 1246.

> **2.    The Conservation Service's explanation for eliminating the farm-efficiency alternatives was neither arbitrary nor capricious.**

Here, the Conservation Service's EA studied in detail a no-action alternative and two action alternatives.  Diridoni Dec. Exh. A at 110-30.  The EA also identified two farm-efficiency alternatives, and provided an appropriate explanation for why those alternatives were eliminated from further study.  *Id*. at 105-07.

Under *Native Ecosystems*, the Conservation Service's explanation for eliminating the farm-efficiency alternatives was neither arbitrary nor capricious.  As the EA and the Response to Comments told the public, on-farm efficiency upgrades are outside the scope of actions the Irrigation District may consider as project sponsor under federal law.   *Id*. at 107; *Id*. Exh. B at 4.  The Irrigation District lacks the authority to "carry out, operate, and maintain on-farm infrastructures owned by [Irrigation District] patrons." *Id*.  Section 2 of the Watershed Protection and Flood Prevention Act, Pub. Law 83-566, specifies that federal support for a project like this requires that the Irrigation District have "authority under State law to carry out,

maintain, and operate the works of improvement."  16 U.S.C. § 1002.

Further, under section 4(3) of the Watershed Protection Act, the Irrigation

District must make satisfactory arrangements with the federal government

for defraying the costs of "operating and maintaining" the project's works of

improvement.  *Id*. § 1004(3).  These federal provisions were an appropriate

reason to eliminate the farm-efficiency alternatives from detailed study.

The Conservation Service's Response to Comments also appropriately

found that the agency eliminated the on-farm efficiency alternative given

"feasibility issues" with "private installation and having enough participants

to effectively conserve water, as well as [] regulatory limitations to

permanently protecting privately conserved water."  Diridoni Decl. Exh. B

at 4.

Further, as the EA found, the farm-efficiency alternatives would not

meet the project's purpose and need to address the public safety risk from

open irrigation waterways.  *Id*.; *Id*. Exh. A at 106, 107.

> ### 3.   Plaintiffs misrepresent the applicable NEPA law and otherwise fall short in showing any likelihood of success.

Plaintiffs misrepresent the NEPA-alternatives standard that applies to

an EA.  The "rigorously explore" standard that Plaintiffs repeatedly cite, Pls.'

Memo 7, 9, applies only to an EIS according to Ninth Circuit precedent.

Plaintiffs fail to acknowledge that controlling law establishes that a lesser alternatives standard applies to an EA.  *See N. Idaho*, 545 F.3d at 1153; *supra* Argument II.A.1.  Plaintiffs state, wrongly, that EAs must follow the "same guidelines regarding development of alternatives as do full [EISs]." Pls.' Memo 7.

Plaintiffs fail to acknowledge the Ninth Circuit's recognition that although an EIS requires an agency to [r]igorously explore and objectively evaluate all reasonable alternatives," an EA requires only that an agency "include a brief discussion of reasonable alternatives."  *N. Idaho*, 545 F.3d at 1153 (internal quotations and citations omitted).

Plaintiffs also wrongly rely on a NEPA-alternatives regulation, 40 C.F.R. § 1502.14, that by its terms applies only to an EIS.  Pls.' Memo 5, 6, 7, 9.  A NEPA regulation that is specific to an EIS does not apply to an EA.  *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012) (holding that a NEPA regulation did not apply to an EA, when the regulation "by its own terms only applies" to an EIS).  And Plaintiffs rely on 40 C.F.R. § 1502.13, Pls.' Mot. 7, but that regulation is also inapplicable to an EA and applies by its terms only to an EIS.

Further, Plaintiffs rely on case law that is inapplicable to an EA's alternatives analysis.  Pls.' Memo 6-7, 8.  Illustratively, *Idaho Sporting*

*Congress v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000) did not even address a NEPA-alternatives issue.   And all of the other NEPA cases cited on pages 7 and 8 of Plaintiff's memo addressed an EIS, rather than an EA.

Aside from these major problems in the basic framing of the claim, Plaintiffs fail to show any likelihood of showing the Conservation Service arbitrarily eliminated the farm-efficiency alternatives from detailed review. Pls.' Memo 7-10.  Plaintiffs argue that NEPA imposes "substantive standards."  Pls.' Memo 2.  Not so.  NEPA requires only that reasonable alternatives be *considered* in an EA, not that a particular alternative be *selected*.  NEPA "does not mandate particular results, but simply prescribes the necessary process."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).

Plaintiffs' memo fails to show how the on-farm efficiency alternative would be workable given the requirements of the Watershed Protection Act. They note that the Irrigation District has authority under an internal rule to "refuse delivery" to a water user if the user's interior delivery system is not "adequate to make beneficial use of the water."  Pls.' Memo 8.  But that same rule states it is the user's responsibility to "provide and maintain" the interior delivery system.  Nothing in the internal rule gives the Irrigation

District authority to *install* or *maintain* the new on-farm efficiency upgrades, or to *operate* those private-property upgrades.

Plaintiffs argue the Conservation Service should have considered an "option" that includes "water use audits that monitor water use (and making it a mandatory requirement for all holders of Permits to Take Water)" along with other measures.  Pls.' Memo 8.  But Plaintiffs never made these suggestions during the NEPA process.  Beyond that, the Conservation Service appropriately told the public that changes in how the Irrigation District charges for water does not meet the project's purpose/need to improve water delivery reliability and public safety.  Diridoni Decl. Exh. B at 8.  And as the Conservation Service emphasized, "[c]hanging water laws is outside the scope of the project."  *Id.* at 45.

Plaintiffs also speculate that the on-farm efficiency alternative was illegally eliminated because of the economic interest they say the Farmers Conservation Alliance has in the HDPE alternative.  Pls.' Memo 9.  This argument is unsupported by any NEPA authority.  The Conservation Service is responsible for the EA and the final project decision, not the Farmers Conservation Alliance.  Plaintiffs also fail to acknowledge their own overriding economic interests in blocking the HDPE alternative.

Finally, Plaintiffs argue that the Conservation Service's identified public-safety purpose/need for the project is a "sham." Pls.' Memo 8. As Defendants explain below, however, this project purpose/need finding is supported by substantial evidence. *See infra* Argument II.D.

## B. Plaintiffs have no likelihood of success on their NEPA cumulative-effects claim.

### 1. Legal standards regarding NEPA cumulative effects.

Under NEPA, an EA must contain a "brief" discussion of environmental effects. 40 C.F.R. § 1508.9(b). The NEPA regulations "do not specifically mention cumulative impact analysis." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002). An EA "may" be deficient if it fails to include a cumulative-effects analysis. *Id.*; *Umpqua Watersheds v. U.S. Forest Serv.*, 725 F. Supp. 2d 1232, 1238-39 (D. Or. 2010). Without some quantified or detailed information in an EA, "neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.* 137 F.3d 1372, 1379 (9th Cir. 1998).

A cumulative-effects analysis is a task assigned to the special competency of the agency and is afforded considerable deference. *See*, *e.g.*, *Kleppe v. Sierra Club*, 427 U.S. 390, 413–14 (1976). An agency may consider cumulative effects in the aggregate or use any other procedure it deems

appropriate.  *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008) ("It is not for this court to tell the Forest Service what *specific* evidence to include, nor how *specifically* to present it.").

> ### 2.   The Conservation Service's analysis of cumulative effects was neither arbitrary nor capricious.

The Conservation Service's EA included "quantified or detailed information" with regard to the project's cumulative effects.

After accounting for the project's direct and indirect effects, Diridoni Decl. Exh. A at 131-81, the EA addressed cumulative effects for all of the resource areas including cultural resources, fish and aquatic species, geology and soils, land use, public safety, recreation, socioeconomic resources, vegetation, visual resources, water resources, wetlands and riparian areas, wildlife, and wild and scenic rivers.  *Id.* at 181-88.  The agency also presented a detailed table covering each of these resource areas in order to "quantify effects," and specified how it defined the duration of effects.  *Id.* Exh. E at 2-7.

The Conservation Service's analysis specifically took into account possible future irrigation measures to pipe canals in other parts of the Deschutes Basin.  *Id.* Exh. A at 183.  Those future measures would conserve water that would otherwise be lost to seepage and evaporation.  *Id.*  The agency noted that wetlands effects from the instant project would be

"minimal and localized," and that the project would "benefit downstream riparian wetlands." *Id*. at 187.  In light of other actions including the future irrigation piping projects, the agency then found that cumulative wetlands effects "would be minor." *Id*.

This finding was neither arbitrary nor capricious.  The project would have minimal and localized wetland effects to irrigation-channel areas that are watered by unintended seepage, and at the same time would benefit instream wetlands in the Deschutes Basin.  Similarly, the future irrigation-piping projects would conserve even more water—172 cfs— in the same basin.  It was appropriate for the agency to find that wetlands cumulative effects would be minor in light of other similar projects aimed at conserving water flows in the Deschutes Basin and reducing seepage and evaporation.

### 3. Plaintiffs fall short in establishing any likelihood of success.

Plaintiffs' focus their cumulative-effects argument on effects to wetlands/riparian habitat adjacent to the irrigation canals and laterals.  Pls.' Memo 10-15.  None of Plaintiffs' arguments suggest any likelihood of success on the merits.

Plaintiffs rely on their retained arborist, Pls.' Memo 10 (citing Madison Decl., ECF 31), but that declaration was created two years after the

challenged August 2018 NEPA decision.  It has no appropriate role in considering the merits.  *See supra* Argument I.A.

Plaintiffs' cumulative-effects claim is also waived and forfeited because they raised no cumulative-effects concerns during the NEPA process and they aired no concerns about the effects of this project in combination with other future irrigation projects.  *See supra* Argument I.B.  As this Court has held in the specific context of a NEPA cumulative-effects claim, "[w]hen the argument is one of degree, rather than an outright failure to address, the plaintiff must raise that argument during the comment period or be precluded from litigating it at a later date."  *League of Wilderness Defs.-Blue Mountain Biodiversity Project v. Bosworth*, 383 F. Supp. 2d 1285, 1296-97 (D. Or. 2005).

Here, Plaintiffs' cumulative-effects argument is one of degree, Pls.' Memo 12-13, but the Conservation Service looked at cumulative effects.  *See* Diridoni Decl. Exh. A at 181-88.  Since Plaintiffs raised no concerns about cumulative effects or the cumulative effects of future irrigation projects during the NEPA process, Plaintiffs have waived and forfeited their cumulative-effects claim.

Even aside from these problems, Plaintiffs have no likelihood of success in showing the agency's prediction of minor wetlands cumulative effects was arbitrary and capricious.  Plaintiffs argue the analysis was inadequate because

"over 260 miles" of "crucial" habitat will be destroyed. Pls.' Memo 13. But they fail to acknowledge the significant water conservation benefits the irrigation-piping projects will bring to the Deschutes Basin. *See* Diridoni Decl. Exh. A at 183. They ignore the instant project's beneficial effects to downstream, natural riparian and wetland areas, *see id.* at 127, 179, and they fail to acknowledge that habitat here is being converted from a canal seepage-enabled artificial system with little ecological value to a historic and ecologically beneficial upland habitat. *See id*. at 178. Nor is the existing habitat especially "crucial." The Conservation Service informed the public that the canal/lateral corridor "has not been identified as a critical habitat feature necessary to support populations of wildlife within the basin." *Id*. Exh. B at 52. *See also id*. Exh. A at 99-100. Water in these irrigation waterways flows only part of the year (during the irrigation season), and ecological function in the areas adjacent to canals/laterals is limited "by routine canal maintenance activities and dewatering outside of the irrigation season." *Id*. at 98.

Plaintiffs are also wrong in alleging there was no quantification of effects to wildlife and vegetation. Pls.' Memo 13. The Conservation Service studied direct and indirect effects to wildlife, Diridoni Decl. Exh. A at 177-80, and found that the project's cumulative effects would be "minor," *id*. at 188, which it quantified. *Id*. Exh. E at 7. Further, the project would have corresponding

beneficial effects on federally-listed aquatic species and fish habitat.  *Id*. Exh. A at 134-37.  As for effects to vegetation, the agency studied direct and indirect effects, *id*. at 148-55, and found that cumulative effects would be "minor," *id*. at 185, which it quantified.  *Id*. Exh. E at 5.  As the EA told the public, vegetation within the Irrigation District's right-of-way would "return to the historic upland habitat," and shift away from "artificial wetlands."  *Id*. Exh. A at 152, 178.  Those ecological effects would be "offset," however, by the project's "gains in water quality and habitat function in the 162 miles of natural riverine systems."  *Id*. at 174.

Plaintiffs disagree with how the Conservation Service assessed cumulative effects to vegetation.  *See* Pls.' Memo 14-15 (arguing that the analysis departed from "what should be the essential analysis").  But as the Ninth Circuit emphasized in rejecting a NEPA cumulative-effects claim, "We will not secondguess methodological choices made by an agency in its area of expertise."  *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993).  The Conservation Service was neither arbitrary nor capricious in how it assessed that there would be "minor" cumulative effects to vegetation given this project and future irrigation projects that will significantly conserve water in the Deschutes Basin.

Plaintiffs note that an Office of Management and Budget ("OMB") fact sheet included with the EA states the project would convert 1,610 acres adjacent to canals/laterals to upland vegetation, but that document does not aid their argument. Pls.' Memo 13-14 (citing Diridoni Decl. Exh. A at 23). This acreage is not all wetlands; instead, about 23 wetland features "sporadically occur" within this entire area. Diridoni Decl. Exh. A at 23. OMB's fact sheet is in line with the Conservation Service's findings that there are 23 sporadically occurring wetland features here and that the HDPE alternative would affect habitat and reduce water availability in the areas adjacent to more than 65 miles of open canals/laterals. *Id.* at 175, 179.[5]

Finally, Plaintiffs argue that the Conservation Service failed to assess the cumulative effects of the other action alternative that the EA considered in detail. Pls.' Memo 15. But as the EA stated, the cumulative effects for both action alternatives are "assumed to be the same except where stated differently." Diridoni Decl. Exh. A at 181. Further, the authorities they cite are EIS-specific regulations that do not apply to an EA, 40 C.F.R. §§ 1502.16, 1502.1, or otherwise do not support their specific argument.

---

[5] OMB is an agency distinct from the Conservation Service and OMB had no NEPA duty for this project. To the extent that OMB's fact sheet is not consistent with the Conservation Service's findings in the EA, that fails to show any NEPA error by the Conservation Service.

### C. Plaintiffs have no likelihood of success on their NEPA costs-benefits claim.

#### 1. Legal standards.

It is well established in the Ninth Circuit that even for an EIS, NEPA does not require a "formal and mathematically expressed cost-benefit analysis." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1286 (9th Cir. 1974). "We do not believe such an analysis is necessary to enable an EIS to serve the purposes for which it is designed." *Id.* As *Trout Unlimited* emphasized, there is "sufficient disagreement about how environmental amenities should be valued to permit any value so assigned to be challenged on the grounds of its subjectivity." *Id.*

NEPA does not require a costs-benefits analysis in the context of an EA. Even for an EIS, the NEPA regulations caution that "[f]or purposes of complying with [NEPA], the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are more important qualitative considerations." 40 C.F.R. § 1502.23.

NEPA's purpose is to protect the environment, not a particular party's economic interests. *See*, *e.g.*, *Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir.1993) ("The purpose of NEPA is to protect the

environment, not the economic interests of those adversely affected by agency decisions."); *Port of Astoria v. Hodel*, 595 F.2d 467, 475 (9th Cir. 1979).

### 2. Plaintiffs fail to establish any likelihood of success on their NEPA costs-benefits claim.

Plaintiffs fail to establish a likelihood of success on their claim that there was a violation of a NEPA costs-benefits duty.  Pls.' Memo 15-23.

No authority supports Plaintiff's novel NEPA procedural requirement that an EA must "analyze the true costs of the project compared with the purported benefits."  Pls.' Memo 15.  Instead, the case law cautions courts not to "engraft[ ] their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 525 (1978); *Wild Wilderness v. Allen*, 871 F.3d 719, 726-27 (9th Cir. 2017) (rejecting a "novel procedural requirement" underpinning a NEPA claim, and citing *Vt. Yankee*).

Plaintiffs fail to cite any NEPA authority requiring that an agency calculate or monetize costs-benefits in an EA, and they ignore the NEPA authority that undermines their claim.  *See supra* Argument II.C.1. Plaintiffs cite an Alabama case, *Burkey v. Ellis*, 583 F. Supp. 897, 910 (N.D. Ala. 1979), but that has no bearing here given the Ninth Circuit law regarding NEPA costs-benefit.  Further, that case addressed an EIS rather than an EA.

Plaintiffs' costs-benefits NEPA claim is also unlikely to succeed on the merits because is heavily premised on Plaintiffs' disagreements about the project's economic effects and their concerns over their own economic interests.  *See*, *e.g.*, Pls.' Memo 16, 17-20, 22-23.  These economic points do not comprise a cognizable NEPA claim.  "The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."  *Nevada Land Action Ass'n*, 8 F.3d at 716.  Illustratively, there could be no NEPA violation regarding the agency's supposedly not weighing the financial burdens on private landowners for dead tree and weed removal and for cleaning up debris.  *See* Pls.' Memo 22-23.

Further, Plaintiffs' claim relies on post-decisional declarations that include information not presented to the Conservation Service during the NEPA process.  Illustratively, Plaintiffs rely heavily on a declaration from a retained economist who works for an economics/financial consulting firm.  ECF 33.  As Defendants explained, this evidence is off-limits in reviewing the merits of Plaintiffs' claims.  *See supra* Argument I.A.

Plaintiffs also never put their costs-benefits contentions before the Conservation Service during the NEPA process.  *See supra* Argument I.C. Illustratively, Plaintiffs argue that water loss to the Deschutes River system from irrigation-canal seepage is not actually "lost" water.  Pls.' Memo 17.  But

this is based on post-decisional declarations, not their own participation in the NEPA process.  Plaintiffs also contend that vegetation near the canals and laterals supports "mental health" and "ecosystem services" such as "sound buffering and pollution abatement."  *Id*.  But Plaintiffs raised none of these issues during the NEPA process.

Similarly, Plaintiffs nitpick the EA's 70%-80% tree survivability assumption when there is active irrigation, Pls.' Memo 20-21, but they failed to raise these concerns during the NEPA process.  Further, courts provide an agency's scientific judgments under NEPA "the highest level of deference." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012). Plaintiffs also failed to bring to the agency's attention their concern that debris left on Irrigation District construction sites will result in "pests, wildfire risks, and further aesthetic deterioration."  Pls.' Memo 23.  All these issues are therefore waived.

The Ninth Circuit's recent ruling is particularly instructive in *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584 (9th Cir. 2018).  There, plaintiffs challenged under NEPA a federal agency's decision to take certain lands into trust for an Indian tribe so it could build a casino complex.  *Id*. at 589.  An Indian gaming statute required a finding that the trust acquisition not be detrimental to the surrounding community.  *Id*.

at 599.  In support of a no-detriment finding under that statute, the agency's

EIS included a study on the economic impacts of the casino.  *Id*. at 599-600.

Relying on a post-decisional expert declaration, the plaintiffs then argued

that the agency violated NEPA by relying on stale data and making improper

economic assumptions in the study.  *Id*. at 606.

*Cachil Dehe* affirmed the district court in striking the declaration in

reviewing the merits of Plaintiffs' NEPA claim, *id*., as the declaration was

completed two years after the challenged agency decision.  *Id*. at 600-01.

Further, the declaration relied on information that was not made available to

the agency during the NEPA process.  *Id*. at 606.  *Cachil Dehe* also

emphasized that the plaintiffs' NEPA claim regarding the economics study

was connected to their assertions of economic harm and not cognizable under

NEPA.  *Id*. at 606.

This case is akin to *Cachil Dehe*.  Here, Plaintiffs rely on post-

decisional declarations with information that was not presented to the agency

during the NEPA process.  Here, similar to the casino economics study

prepared in *Cachil Dehe* under an Indian gaming statute, the Conservation

Service prepared a NED analysis to study economics costs and benefits under

the Watershed Protection Act, and Plaintiffs argue that the agency made

various economics errors.  As in *Cachil Dehe,* this Court should strike the

declarations in considering the merits of Plaintiffs' NEPA claims and reject the merits of Plaintiffs' supposed NEPA claims that are rooted in assertions of economic impacts or their personal economic harm from the project.

Although NEPA does not require a formal costs-benefits approach, the EA appropriately considered the project's effects to recreation and visual resources.  As it found, the long-term recreational use of public parks and the rights-of-way "would not change," although recreationalists would have views of a vegetated corridor rather than either open water or an empty canal, depending on the season.  Diridoni Decl. Exh. A at 145.  The Conservation Service took this effect into account as a "negligible, long-term effect to recreational resources" and did not assign it a monetized value.  *Id*.

The EA also appropriately accounted for the project's effects to visual resources, meaning the introduction of disruptive visual characteristics or when project activities visually stand out from the existing landscape.  *Id*. at 156-58.  The Conservation Service found there would be minor, long-term effects due to the change of appearance from open canals and riparian plants to buried pipe with upland vegetation, with the revegetated corridor blending in with the natural landscape following revegetation.  *Id*. at 129, 158.  The Conservation Service did not monetize the "visual loss of waterways."  *Id*. at 157.

To the extent that Plaintiffs' NEPA claim attempts to challenge the substance of the Conservation Service's NED analysis under the Watershed Protection Act, there is no likelihood of success.  Plaintiffs' first amended complaint, ECF 23, asserts only NEPA procedural claims and does not allege any violations of the Watershed Protection Act.  Plaintiffs have no likelihood of success on an unpleaded claim.  Further, under the APA, "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

### D.    Plaintiffs fail to establish any likelihood of success on their NEPA claim that reducing drowning risk was an arbitrary and capricious project need.

Plaintiffs have no likelihood of success on their claim that the Conservation Service violated NEPA in finding that one of the project's needs was to address public drowning risk.  Pls.' Memo 23-25; Diridoni Decl. Exh. A at 38, 68.

Under NEPA, an EA must include a brief discussion of the need for a proposal.  C.F.R. § 1508.9(b). The court provide an agency "considerable discretion to define a project's purpose and need," but "a purpose and need statement will fail if it unreasonably narrows the agency's consideration of

alternatives so that the outcome is preordained." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013) (citations omitted).

Plaintiffs fail to establish a likelihood of success for several reasons. First, Plaintiffs make no mention whatsoever of safety with open irrigation waterways or drowning risk in their current amended complaint. ECF 23 at ¶¶ 17-22. Plaintiffs cannot establish they would prevail on a NEPA claim not alleged or articulated in their own pleading.

Second, eliminating or reducing drowning risk in irrigation waterways is a valid need. *See Wild Wilderness v. Allen*, 871 F.3d 719, 729-30 (9th Cir. 2017) (rejecting a NEPA "purpose and need" challenge to an EA's identification of the need for safe parking, when "[t]here is support in the record for the need for safe parking").

An agency's factual findings are reviewed for substantial evidence, under which a court must "uphold the [agency]'s findings unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." *Monjaraz–Munoz v. I.N.S.*, 327 F.3d 892, 895 (9th Cir. 2003).

Substantial evidence supports the EA's finding of a need to address public safety in irrigation waterways. Drowning is a real risk especially as the central Oregon population continues to grow, and piping currently open waterways will eliminate that risk. *See* Diridoni Decl. Exh. A at 38, 144.

Drowning in irrigation waterways has been a central Oregon public concern for years.  The EA specifically referenced a central Oregon newspaper article on drowning deaths in irrigation systems, *Boy's Death Renews Concerns Over Safety of Urban Canals.  Id*. at 68, 220.  As that article noted, "Even some people who have opposed piping efforts in the past said the public safety issue needs to be addressed."  *Id*. Exh. I at 3.

As the Conservation Service told the public, reducing risks to the public is a guiding principle in its federal water investments.  *Id*. Exh. B at 9.  The agency also quantified the risk of future drowning.  *Id*. Exh. D at 34.  The HDPE alternative would "eliminate" any drowning risk from open irrigation waterways, which would result in a minor, long-term public safety benefit. *Id*. Exh. A at 144.  Plaintiffs entirely fail to challenge, much less rebut, the agency's finding that piping the open waterways here would eliminate the risk of drowning.

Plaintiffs argue that this public-safety risk is a sham, but their argument is based on their philosophical view rather than the factual record.  Plaintiff Callen told the Conservation Service during the NEPA process that "if you're concerned about drowning in an irrigation ditch, you don't belong in Central Oregon."  *Id*. Exh. G at 2.   He said, "It's called common sense."  *Id*.

Plaintiffs also argue that public safety is an arbitrary need, because the Conservation Service did not describe precise particulars such as "exactly where the water depth and velocity reaches the described levels or how many times a year it reaches those levels." Pls.' Memo 24. They also argue that the agency needed to undertake a study of risk in the Irrigation District's waterways rather than look to deaths in neighboring irrigation districts in central Oregon. *Id.* at 25.

But Plaintiffs never raised any of these points during the NEPA process[6] and they exaggerate the agency's obligations in identifying the need for a project. The agency was required only to briefly discuss the need for the project, 40 C.F.R. § 1508.9(b), not undertake formal risk or water depth-and-velocity studies. The identification of a public-safety need is supported by the substantial evidence and is due considerable discretion.

### E.    Plaintiffs fail to establish any likelihood of success on their NEPA recreation-effects claim.

Nor do Plaintiffs establish any likelihood of success on their claim that the Conservation Service violated NEPA with regard to assessing effects on recreation. Pls.' Memo 25-26.

---

[6] Plaintiffs argue that the project would increase wildfire risks to public safety but they failed to identify this contention during the NEPA process and they cite no facts to animate their bare contention.

During the NEPA process, Plaintiffs failed to bring any concern about recreation effects to the Conservation Service. *See supra* Argument I.C. Plaintiffs' claim also relies on the Madison declaration, but that is inappropriate post-decisional information in considering the merits. *See supra* Argument I.A.

Plaintiffs show no likelihood of success because their recreation-effects claim is premised on their substantive disagreement with the Conversation Service's chosen project alternative. Plaintiffs argue that the project is "inappropriate for the character of the region." Pls.' Memo 26. But "NEPA does not guarantee substantive results." *Nat'l Parks and Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 682 (9th Cir. 2000). Plaintiffs might disagree with the Conservation Service's substantive conclusions, but this fails to show any NEPA violation. *See WildEarth Guardians v. Provencio*, 923 F.3d 655, 670 (9th Cir. 2019). Further, Plaintiffs' formulation of the "regional character" issue is inaccurate; Plaintiffs ignore that the project will serve the area's natural ecosystem character, by converting artificial seepage-enabled systems to native upland and by conserving scarce water and benefiting natural instream riparian ecosystems and habitat.

Aside from these problems, Plaintiffs fail to establish that the EA's effects analysis for recreation was arbitrary and capricious. The EA found

that long-term recreational use of public parks and the Irrigation District's

rights-of-way "would not change," although recreationalists would have views

of a vegetated corridor rather than either open water or an empty canal,

depending on the season.  Diridoni Decl. Exh. A at 145.  The Conservation

Service took this effect into account as a "negligible, long-term effect to

recreational resources."  *Id*.  Plaintiffs argue that the EA made "no attempt"

to quantify recreation effects.  Pls.' Memo 26.  But there is no NEPA duty to

quantify direct/indirect effects, and in any event the Conservation Service

quantified effects by defining terms such as "minor" and "negligible" in

specific regard to recreation effects.  Diridoni Decl. Exh. E at 4.  Nor is there

any NEPA duty to monetize expected effects to recreation or other resource

areas.  The EA also appropriately accounted for effects to visual resources.

*Id*. Exh. A at 156-58; *see supra* Argument II.C.2.

### F.    Plaintiffs fail to establish any likelihood of success on the merits of a brand-new non-NEPA claim.

Finally, Plaintiffs are unlikely to prevail in their claim that the

Conservation Service violated 7 C.F.R. § 622.11(a)(6).  This regulation is not

under NEPA but describes when a watershed project is eligible for federal

funding under the Watershed Protection Act.  The regulation provides that to

be eligible for funding, a project "[c]annot be installed by individual or

collective landowners under alternative cost-sharing assistance."  *Id*.

Plaintiffs have no likelihood of prevailing on this claim, because they neither raised their concern about funding eligibility during the NEPA process nor alleged this claim in their pending complaint in this Court. There is no likelihood of success on a waived, unpleaded claim.

Further, Plaintiffs fail to explain how it could even be feasible for *landowners* in this Irrigation District to themselves *install* this project— either the canal-lining alternative or the selected HDPE alternative—under alternative cost-sharing assistance.  7 C.F.R. § 622.11(a)(6).  Plaintiffs fail to identify any means for landowners to take over the Irrigation District's waterways and rights-of-way and install this project on their own.

Further, nothing in the regulation dictates that the Conservation Service must make formal findings regarding section 622.11(a)(6) within a project EA—or even that the agency must document funding eligibility in any particular way.

For all these above reasons, Plaintiffs are unlikely to prevail on the merits of any of their claims against Federal Defendants, and this Court should therefore deny Plaintiffs' motion for preliminary injunction.

## III.    Plaintiffs fail to establish a likelihood of irreparable harm.

### A.    Legal background.

Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis in original).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Serv. Co., Inc. v. Balrige*, 844 F.2d 668, 674 (9th Cir. 1988). This is because a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing" that Plaintiffs are "entitled to such relief." *Winter*, 555 U.S. at 22.

In NEPA cases, an injunction is appropriate "only if the traditional four-factor test is satisfied," and "no thumb on the scales is warranted." *Sierra Forest Legacy v.  Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011) (citing *Monsanto Co.  v. Geertson Seed Farms*, 561 U.S. 139, 157-58 (2010) (internal quotation omitted)).  As this Court has emphasized, it "may not presume irreparable harm upon a showing of likelihood of success on the merits or a finding of a NEPA . . . violation." *ONDA v. Sabo*, 854 F. Supp. 2d 889, 897 (D. Or. 2012).

### B.    Plaintiffs fail to meet their burden of establishing immediate irreparable harm.

The centerpiece of Plaintiffs' claim of irreparable harm is monetary harm from property devaluation.  *See* Pls.' Memo 34 ("The Property owners will immediately lose hundreds of thousands of dollars in the form of decreased property values.").  But there is no likelihood of irreparable harm from property devaluation, because Plaintiffs are able to seek adequate compensatory relief from the Irrigation District in the standard course of this litigation.

Economic damages are not considered irreparable if the injury can later be remedied by a damage award.  *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  In this action, Plaintiffs are asserting a large monetary claim against the Irrigation District for property devaluation.  *See* ECF 23 ¶¶ 26, 31 & Prayer for Relief 4.  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).[7]

---

[7] Plaintiffs rely on an appraiser's declaration regarding property values, but that declaration is speculative and does not disclose its underlying data. ECF 32, Lyon Decl.  In addition to the "mystery data" problem, Lyon fails to suggest anything but a temporary "paper" loss in appraised value.  There is

To the extent that Plaintiffs also argue they face irreparable aesthetic harm from vegetation loss in the Irrigation District's right-of-way, they fail to show likely irreparable harm. There are no declarations, affidavits, or other evidence from any of the Plaintiffs themselves in support of their motion for extraordinary equity.  Plaintiffs instead rely on a retained arborist, Madison, but Madison only assessed "damage to their properties."  Madison Decl., ECF 31 ¶ 2.

In his conclusion, Madison states there will be permanent losses in the aesthetic and financial value "of the subject properties," but provides no showing that these Plaintiffs themselves, as opposed to their properties, will suffer immediate irreparable harm.  *Id.* ¶ 17.  Instead, he only generally notes that trees and vegetation "supply numerous benefits to humans." *Id.* ¶ 16.

Madison also acknowledges that Plaintiffs could provide supplemental irrigation to retain the existing vegetation on the Irrigation District's right-of-way, but claims without evidence that would be "cost-prohibitive" to use their own water to do so.  *Id.* ¶ 9.  But nothing would prevent Plaintiffs from

no evidence that Plaintiffs are planning to sell their property or establishing how Plaintiffs cannot irrigate their property themselves.

seeking compensatory relief from the Irrigation District for their financial loss in irrigating vegetation on their own property.

Madison references the Smith property, ECF 31 at 10-11, but that property is not within the Allen lateral at issue in these injunction proceedings. Madison also references the Powell property, ECF 31 at 12-13, but Powell did not participate in the Conservation Service's NEPA process and Powell alleges only monetary claims against the Irrigation District, not any NEPA claim against Federal Defendants. Callen has property on the Allen lateral, but the Madison declaration fails to discuss Callen's property except its economic value and does not identify any irreparable harm specific to Callen or his property. Further, the other Plaintiffs have no NEPA claim and assert only money claims against the Irrigation District. *See supra* Argument I.B.

Finally, Plaintiffs' supposed irreparable harm is undermined by their delay in seeking extraordinary equity. The Conservation Service reached its final project decision more than two years ago, and Federal Defendants understand that the Irrigation District since then has undertaken extensive work and expended substantial resources towards project implementation. As this Court found in denying a preliminary injunction motion against a timber project, a plaintiff's delay of "nearly half a year" before bringing suit

justified denial of the motion. *Headwaters, Inc. v. Bureau of Land Mgmt.*, 665 F. Supp. 873, 876 (D. Or. 1987) (citing *Lydo Enter., Inc. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984)); *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm[.]").

Here, Plaintiffs delayed for *more than eighteen months* to file their action, ECF 1, after the Conservation Service reached its project decision. Then, they waited *another six months* to move for extraordinary equity. Plaintiffs' delay undermines their claims of irreparable harm.

Because Plaintiffs fail to establish a likelihood of irreparable harm, this Court should deny a preliminary injunction.

## IV.   The balance of equities/hardships does not favor a preliminary injunction.

"To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). The Court must then weigh "the hardships of each party against one another." *Id*.

The hardships here do not tip in Plaintiffs' favor. They assert harm to their own private and economically-centered interests. *See* Pls.' Memo 36 (stating in its hardships argument that Plaintiffs "have no way of protecting

their economic interests aside from the current lawsuit"); ECF 31-33 (Plaintiffs' retained-expert declarations). Plaintiffs are attempting to assert a water right that doesn't exist—a right to unintended seepage which allows trees to grow on their private property and boost their property values.

With this project's implementation, Plaintiffs in the Allen lateral area will experience less of a hardship and more of a removal of a windfall that does not serve others' interests. Plaintiffs' properties are subject to long-established Irrigation District easements and rights-of-way. They have received a private benefit from unintended water seepage in the antiquated irrigation system. The right-of-way vegetation and habitat that is Plaintiffs' windfall is a non-native system artificially supported by water seepage from the current irrigation infrastructure.

Further, Plaintiffs' supposed hardship must be discounted because they either entirely failed to participate in the NEPA process or failed to identify to the Conservation Service the issues they now belatedly claim are so important. The EA documents a thorough project planning process that involved various stakeholders across a range of interests. Throwing this project into uncertainty, at the 11th hour, unjustly tips the scales of equities.

Plaintiffs are incorrect that Defendants would suffer only minimal "financial" losses from a preliminary injunction. Pls.' Memo 35. Even

Plaintiffs refer to the "in-stream environmental benefits" derived from the project. Pls.' Memo 36. Plaintiffs seeks an injunction that would indefinitely freeze progress towards these important benefits. This is hardship to Federal Defendants and the many stakeholders that support this project.

The hardships favor Federal Defendants because project implementation in the Allen lateral area will commence the long-awaited implementation of a water-conservation project with broad, valuable public benefit as found by the Conservation Service. This project is a Watershed Protection Act initiative, and frustrating and delaying progress would unduly delay and interfere with the Act's policy that the federal government cooperate with states and irrigation districts to further the conservation and utilization of water, the improvement of water resources, and the quality of the environment. 16 U.S.C. § 1001.

As the Conservation Service emphasized in the EA, water resources "have been a community focus within the Deschutes Basin." Diridoni Decl. Exh. A at 28. Irrigation agriculture is the primary out-of-stream water use in the basin, and implementing the project will help reduce problematic water losses associated with the badly outdated irrigation infrastructure. *Id*. at 36-38. Freezing ground operations on this important federal-supported project is a hardship to, and antithetical to, this broadly-supported initiative.

By implementing the project on the ground, more water will be restored instream more quickly.  *Id*. at 28.  Under the State of Oregon's Conserved Water Program, project implementation would formally create new in-stream water rights that are "permanently protected and unavailable for other uses." *Id*. at 39.  With project funding as planned, 100% of the conserved water would be allocated instream.  *Id*.  This would benefit natural downstream habitat, water quality, and federally-listed fish and aquatic species.  *Id*. at 137, 175.

Because the balance of hardships do not tip in Plaintiffs' favor, this Court should deny a preliminary injunction.

## V.    A preliminary injunction is not in the public interest.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation omitted).

Implementing this project without delay is in the public interest.  The State of Oregon's Water Resources Department found the Allen lateral project implementation—the direct target of Plaintiffs' requested injunction— as the #1 ranked project for recommended funding.  Martin Decl. Exh. A at 2.[8]  The work that Plaintiffs seek to stop has the highest economic public

---

[8] The Oregon Water Resources Department identifies the project as

benefit score of all the state's water project grants and loans, and the highest overall public benefit score. *Id*.

The Oregon Governor's Office also recognizes the public importance of this project. In a letter to the Conservation Service, the Governor's Office emphasized "the need" to implement investments in water conservation that support instream, municipal, and agricultural uses. Diridoni Decl. Exh. H at 1. The project, the Governor's Office stated, "is an investment that moves this priority forward." *Id*. *See also id*. at 1-2 (noting support for the project from the Oregon Department of Fish and Wildlife). Further, the non-profit Coalition for the Deschutes endorses the project, as "river advocates who also support sustainable irrigated agriculture in Central Oregon." *Id*. at 7-8.

Here, an injunction serves Plaintiffs' private interests but disserves the public interests. It is not in the public interest to block a broadly-supported project because Plaintiffs do not want to pay their own way to maintain their private-property vegetation. It is not in the public interest to freeze progress towards needed water-infrastructure improvements that will benefit the fast-growing but water-scarce central Oregon region. It is not in the public interest to freeze progress towards allocating 100% of the project's conserved

---

"Deschutes Basin Flow Restoration—Group 3," which corresponds to the Allen lateral enclosure and piping work at issue for the project in this action. Martin Decl. Exh. B at 2.

water to natural, instream use that will benefit water quality, habitat, and imperiled species.

Plaintiffs say an injunction is in the public interest because they raise NEPA claims. Pls.' Memo 36-37. But they play fast and loose with that process, by attempting to support claims based on post-decisional information and by advancing claims they never raised earlier. *See supra* Argument I.A, I.C. Further, no environmental-advocacy organizations or other non-profit groups are litigating against this project.

Finally, Plaintiffs ignore—and at least one Plaintiff has flatly denied—the project's benefit to public safety. As discussed above, the project will eliminate any risk from drowning in the currently open irrigation waterways, which have claimed several lives in nearby canals. Diridoni Decl. Exh. I. But as Plaintiff Callen emphasized in his public comments, "if you're concerned about drowning in an irrigation ditch, you don't belong in Central Oregon." *Id*. Exh. G at 2. This is the case in a nutshell: Plaintiffs would have this Court enjoin this important project to maintain their property values despite the costs to other water users, the environment, and public safety.

Because an injunction is not in the public interest, this Court should deny a preliminary injunction.

**VI.    Plaintiffs' requested injunction is not narrowly tailored and could prejudice other property owners who are not before this Court.**

Courts recognize that an injunction should be narrowly tailored to remedy only the specific harms shown by a plaintiff, rather than to enjoin all possible breaches of the law. *See Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (citation omitted).

Federal Defendants understand that although some Plaintiffs here have properties in the Allen lateral area, there are close to 40 additional tax lots in this area. Shutting down all project work on the Allen lateral area is not narrowly tailored to the private harms alleged by Plaintiffs. Instead, shutting down all work in area may prejudice other tax-lot owners in the area who desire progress towards water savings, less seepage, enhanced instream flows downstream, and reducing the public-safety risk from open irrigation waterways. An injunction must be narrowly tailored "to affect only those persons over which [the court] has power." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983).

Therefore, at most, any injunction should only address project ground operations within the Irrigation District's rights-of-way and easements on these Plaintiffs' particular properties in the Allen lateral area.

## VII.  Plaintiffs should be required to post an appropriate bond for any injunction.

Under Fed. R. Civ. P. 65(c), a district court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Here, Plaintiffs should post an appropriate bond.

Plaintiffs are asking to freeze work on a significant conservation effort that is the state Water Resource Department's top-ranked public-benefit project.  Plaintiffs' request for extraordinary equity threatens inefficiencies and would indefinitely delay the start (and finish) of ground work to complete this significant water conservation measure.

Federal Defendants are aware of no case law establishing that merely invoking environmental laws entitles a plaintiff to waive the requirements of Fed. R. Civ. P. 65(c).  And here, Plaintiffs are not acting in the public interest.  They are individual property owners acting to protect their own financial interests, and to prevent activity that serves the greater good on long-established Irrigation District easements on their property.  Plaintiffs

have a significant financial interest in this litigation; they are pursuing in large monetary damages against the Irrigation District.

Plaintiffs do not establish that an exception to bond is warranted. They have not shown they are unable to pay. To the contrary, their litigation shows they enjoy financial resources—they have already retained three litigation experts to help them press their case. ECF 31-33. And one of their financial experts says their properties are each worth close to one million dollars or more. Lyon Decl., ECF 32 ¶ 10.

## CONCLUSION

For all these reasons, this Court should deny Plaintiffs' request for a preliminary injunction.

Dated this 13th day of October, 2020.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

*/s/ Sean E. Martin*
SEAN E. MARTIN
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

The preceding memorandum complies with the applicable word-count limitation under LR 7-2(b), pursuant to Federal Defendants' unopposed motion to extend word-count allowance, because it contains less than 13,500 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, glossary, signature block, and any certificates of counsel.

Dated this 13th day of October, 2020.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney
District of Oregon

*/s/ Sean E. Martin*
SEAN E. MARTIN
Assistant U.S. Attorney