IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MATTHEW JAMES SMITH, PAUL CALLEN, KATHY POWELL, ALLAN D. CLACK, DARREN PARKER, LYNN WARNER, KEVIN CORKERY, and ANN CORKERY, | No. 6:20-cv-00345-MK |
| | OPINION & ORDER |
| Plaintiffs, | |
| v. | |
| TUMALO IRRIGATION DISTRICT; RONALD ALVARADO, in his official capacity as State Conservationist, Natural Resources Conservation Service, United States Department of Agriculture; and NATURAL RESOURCES CONSERVATION SERVICE, a federal agency of the United States Department of Agriculture, | |
| Defendants. | |

**MCSHANE, Judge**:

Plaintiffs are property owners wishing to preserve the irrigation canals that run through their property in Central Oregon. To that end, they seek a preliminary injunction that would halt implementation of the Tumalo Irrigation District Modernization Project ("The Project") in the Allen lateral area. Pl.'s Mot. 1–2, ECF No. 28. Plaintiffs contend that the Natural Resources Conservation Service ("NRCS") and Ronaldo Alvardo (collectively, "Federal Defendants") have violated the National Environmental Policy Act ("NEPA"). Next, they allege that the Tumalo

1 – OPINION AND ORDER

Irrigation District ("Irrigation District") is violating state law related to private nuisance and permissible right of way. Because Plaintiffs have not established the likelihood that they will succeed on the merits of their claim, that an injunction is in the public interest, or that the balance of equities tips in their favor, Plaintiffs' Motion for Preliminary Injunction, ECF No. 28, is DENIED.

## FACTUAL BACKGROUND

The project is a joint effort between the Irrigation District and the NRCS. The project is to take place within the Upper Deschutes watershed in Central Oregon and its purpose is to "modernize the existing irrigation infrastructure by enclosing and piping up to 1.9 miles of the Irrigation District's canals and 66.9 miles of its lateral (feeder canals)." NRCS Resp. 3, ECF No. 40 (citing Decl. of Gary Diridoni ("Diridoni Decl.") Ex. A at 116, 118). The NEPA review process began in June 2017. *Id.* at 5. In April 2018, after an initial public comment period, the NRCS published a draft Environmental Assessment ("EA"). *Id.* at 6. After reviewing public comment on the draft EA, a final version was published in August 2018. *Id.*

As stated in the final EA, "the project's purposes are to improve water conservation, water delivery reliability, and public safety on . . . Irrigation District-owned canals and laterals." *Id.* Within the NEPA process, the NRCS focused on three alternative implementation plans after considering and eliminating nine others. *Id.* at 6–7. Of the three plans, the High-Density Polyethylene ("HDPE") piping alternative proposed the replacement of open canals and laterals with an enclosed HDPE pressurized pipeline system. *Id.* at 7. The HDPE alternative would eliminate all water loss from seepage and evaporation, increase water delivery to farms, reduce costs, and "reduce carbon emissions by about 2,300 metric tons/year." *Id.* While the EA acknowledged that the HDPE alternative would harm riparian vegetation along the irrigation

2 – OPINION AND ORDER

canals and laterals due the elimination of water seepage, it concluded that other factors would mitigate this concern. *Id.* at 8.

Only two Property Owners, Matthew Smith and Paul Callen, participated in the NEPA process. Both Smith and Callen noted their disagreement with the safety concerns raised by the EA regarding open canals and drowning. They noted their discontent with how their property values would be diminished by the installation of piping. *Id.* at 10–11. Smith also specifically questioned the EA's dismissal of an "alternative . . . requiring water users to be more efficient and responsible with their water use, in lieu of an engineering project." *Id.* at 11.

After the EA was published, State Conservationist Ronaldo Alvarado signed a Finding of No Significant Impact ("FONSI") and implemented the HDPE alternative because it was determined that this alternative "best met the project's purposes and need under the NEPA while maximizing net economic benefits." *Id.* at 9 (quotation omitted). The Office of the Oregon Governor and the U.S. Fish and Wildlife Service, during the NEPA comment period, stated their support for the project. *Id.* at 11–12. The FONSI constituted "final agency action" subject to this Court's review. Administrative Procedure Act ("APA"), 5 U.S.C. § 704.

This Court dismissed two of Property Owners' original claims against the Federal Defendants. *See* ECF No. 15, 18. The Property Owners filed an amended complaint in August 2020. First Amended. Compl., ECF No. 23. Plaintiffs moved for a preliminary injunction against all Defendants barring them from starting construction along the Group 3 Allen lateral. Defendants have informed the Court that they will begin construction at the end of November, unless a court order prevents them.

///

///

**STANDARDS**

A plaintiff seeking a preliminary injunction must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When there are "serious questions going to the merits," a court may still issue a preliminary injunction when "the balance of hardships tips sharply in the plaintiff's favor," and the other two factors are met. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The Court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

**DISCUSSION**

**I.    MERITS OF PLAINTIFFS' NEPA CLAIMS**

Agency decisions under NEPA are reviewed by this Court under the APA. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011) (per curiam). Under the APA, a court's review of an agency decision should be searching but narrow, and the reviewing court should take care not to substitute its judgment for that of the agency. *Oregon Wild v. United States*, 107 F. Supp. 3d 1102, 1109 (D. Or. 2015) (citing *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). Under this review, the Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. An agency decision made without adherence to required procedure is not in accordance with law. *Id.*; *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000).

But Federal Defendants first contend that "significant threshold failings undermine [the Property Owners'] arguments regarding the merits of their claims." NRCS Resp. 17. They specifically argue that the Property Owners cannot rely on post-decisional evidence and that Property Owners have waived most of their claims by not raising them during the NEPA process. *Id.* at 17–23.

This Court has recognized a "post-decisional bar to extra-record materials" in the NEPA context. *See Concerned Friends of the Winema v. U.S. Forest Serv.*, No. 1:14-cv-737-CL, 2017 WL 5957811, at *1 (D. Or. Jan. 18, 2017) (citing *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130–31 (9th Cir. 2012)). Because Plaintiffs rely heavily upon expert declarations made two years after the FONSI in 2018, Federal Defendants argue that without this evidence, Plaintiffs' NEPA claims must fail. Relatedly, the Federal Defendants also note that "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue *meaningful consideration*." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)) (emphasis added). While Plaintiffs Smith and Callen provided comments during the appropriate review period, the Federal Defendants insist that they failed to raise the specific issues at the heart of this litigation and thus Plaintiffs have waived these issues. *Pub. Citizen*, 541 U.S. at 764–65.

Plaintiffs counter that the Court can consider their submitted evidence for two reasons: (1) that the "extra-record materials" are "to explain how the agency overlooked obvious deficiencies in the EA" and (2) that the EA's flaws were "so obvious" that it was unnecessary to raise these concerns during the comment period. *See* Pl.'s Reply Br. 1, 4, ECF No. 47 (citing

5 – OPINION AND ORDER

*Pub. Citizen*, 541 U.S. at 765; *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703–04 (9th Cir. 1996)). As the Court alluded to during oral argument, it is not entirely convinced that Plaintiffs have met this threshold bar.

But even if Plaintiffs' NEPA claims do not fail here, the Court still finds that Plaintiffs are unlikely to succeed on the merits. NEPA claims are reviewed under the "arbitrary and capricious" standard of the APA. *Ctr. for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1005 (9th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)). This reviewing standard is "highly deferential, presuming the agency action to be valid" and the Court "may only set aside decisions that have no basis in fact . . . not those with which [the Court] disagree[s]." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quotation omitted); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003). As explained by the Supreme Court, an agency action is arbitrary and capricious only:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., Inc.*, 463 U.S. 29, 43 (1983).

Plaintiffs argue that NRCS's decision was arbitrary and capricious in several ways and the Court addresses each in turn.

**A. EA Review of Alternatives**

Plaintiffs first argue that the EA failed to include viable alternatives to the HDPE alternative. *See* Pl.'s Mot. 6. The Court reviews the NRCS's "range of [NEPA] alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to

permit a reasoned choice." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998). Important here, the NRCS's "obligation to consider alternatives under an EA is a lesser one than under an EIS." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008). For an EA, it must include "a brief . . . discussion of alternatives" because the EA is "a concise public document." 40 C.F.R. § 1508.9. There is also no requirement that an EA must discuss *why* an alternative was eliminated from detailed study. 40 C.F.R. § 1502.14(a).

The EA here provided detailed studies for a no-action alternative and two action alternatives. Diridoni Decl. Ex. A at 110–30. The EA also explained that two other farm-efficiency alternatives were eliminated from further study. *Id.* at 105–07. While the Property Owners argue that the dismissal of these alternatives was arbitrary and capricious, the Court disagrees. First, Plaintiffs incorrectly believe that the EA needed to apply a "rigorously explore" standard for alternatives, but that standard is one applicable to an EIS. *See* Pl.'s Mot. 7–9; *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012) (holding that a NEPA regulation did not apply to an EA, when the regulation "by its own terms only applies" to an EIS). Second, the EA here included multiple explanations of why different alternatives were not considered. Failing to select Plaintiffs' preferred alternative is not arbitrary or capricious. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989) ("[NEPA] does not mandate particular results, but simply prescribes the necessary process.").

Ultimately, while Plaintiffs are particularly aggrieved with NRCS's decision not to implement the on-farm efficiency alternative, the agency adequately considered this alternative. The on-farm efficiency alternative required the Irrigation District to monitor and audit water use by farms, and the EA addressed the deficiencies with this alternative by noting that it would not improve water delivery reliability, improve public safety, and that it would require the alteration

7 – OPINION AND ORDER

of "water laws . . . outside the scope of the project." Diridoni Decl. Ex. B at 8, 45 (explaining how the on-farm efficiency alternative would violate the Watershed Protection Act). Plaintiffs argument fails because NRCS "set forth . . . alternatives necessary to permit a reasoned choice." *Presidio Golf Club*, 155 F.3d at 1160.[1]

### B. EA Cumulative Effects

Plaintiffs next argue that the EA failed to provide an adequate analysis of the cumulative effects of the project. *See* Pl.'s Mot. 10. An EA "may" be deficient without a cumulative-effects analysis because "neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998). Here, the EA addressed cumulative effects on fish and aquatic species, geology and soils, land use, public safety, recreation, socioeconomic resources, vegetation, wetlands and riparian areas, and wildlife. Diridoni Decl. Ex. A at 181–88. The EA's cumulative-effects analysis found that "the project would have minimal and localized wetland effect to irrigation-channel areas that are watered by unintended seepage, and at the same time would benefit instream wetlands in the Deschutes Basin." NRCS Resp. 32.

While Plaintiffs argue that the EA needed to more thoroughly focus on the cumulative effects to riparian habitat near impacted canals and laterals, the Court cannot "secondguess methodological choices made by an agency in its area of expertise." *Inland Empire*, 992 F.2d at 981. And while the EA did concede that while vegetation within the Irrigation District's right-of-would shift away from "artificial wetlands," these effects would be "offset" by the project's

---

[1] The Property Owners also argue that on-farm efficiency alternative was illegally eliminated because of the economic interest of the Farmers Conservation Alliance, which is ironic considering the Property Owners' economic interest in preventing the implementation of the HDPE alternative. NRCS Resp. 29 (citing Pl.'s Mot. 9).

8 – OPINION AND ORDER

"gains in water quality and habitat function in the 162 miles of natural riverine systems." Diridoni Decl. Ex. A at 152, 174, 178. NRCS thus concluded that the cumulative effects would be "minor." *Id.* at 177–180, 188.

While Plaintiffs may disagree with how the NRCS assessed the cumulative effects to vegetation on their property, the Court finds that NRCS review was neither arbitrary nor capricious.

### C. Cost-Benefits Analysis

Plaintiffs also argue that the EA violated NEPA by not including a cost-benefits analysis. *See* Pl.'s Mot. 15–23. But NEPA does not require a "formal and mathematically expressed cost-benefit analysis." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1286 (9th Cir. 1974). That is because NEPA was enacted to protect *the environment*, not a party's economic interest. *See, e.g.*, *Nv. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."). As a result, it was unnecessary for the EA to include a cost-benefit analysis.

### D. Drowning Risk

Plaintiffs next argue that the NRCS's consideration of the drowning risk posed by open canals and laterals is a "sham." *See* Pl.'s Mot. 23–25. The Court reviews for substantial evidence and will "uphold [an agency's] findings unless the evidence presented would compel a reasonable finder of fact to reach a contrary result." *Monjaraz-Munoz v. I.N.S.*, 327 F.3d 892, 895 (9th Cir. 2003). As discussed in the EA, drowning in irrigation canals is a risk to be exacerbated by more people moving into Central Oregon, and piping these open waterways will eliminate that risk. Diridoni Decl. Ex. A at 38, 144. While the Plaintiffs may disagree with the legitimacy of this risk, it was still something NRCS could consider. 40 C.F.R. § 1508.9(b). It

9 – OPINION AND ORDER

would have been surprising had they not. Because it was not arbitrary or capricious for the EA to address and consider the drowning risk posed by open canals, Plaintiffs argument under this theory fails.

### E. Recreation Effects

Plaintiffs final NEPA argument is that the EA incorrectly addressed the effects the project would have on recreation in the Deschutes Basin. *See* Pl.'s Mot. 25–26. But again, the EA did include an effects analysis on recreation, specifically finding that the project would only have a "negligible, long-term effect to recreational purposes" because the only alteration would be views of a vegetated corridor rather than an open canal. Diridoni Decl. Ex. A at 145. While it is unquestionable that Central Oregon has become a popular recreation area, "NEPA does not guarantee substantive results." *Nat'l Parks and Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 682 (9th Cir. 2000). The Court thus finds that there is nothing in the record suggesting that NRCS conduced an arbitrary or capricious review of the project's impact on recreation.

## II.     MERITS OF PLAINTIFFS' 7 C.F.R. § 622(a)(6) CLAIM

Plaintiffs final federal claim is that NRCS violated their own regulation. Specifically, they contend that "NRCS funding is . . . [available] only if the watershed project '[c]annot be installed by individual or collective landowners under alternative cost-sharing assistance.'" Pl.'s Mot. 26 (quoting 7 C.F.R. § 622(a)(6)). This regulation is unrelated to NEPA and describes when a watershed project is eligible for federal funding under the Watershed Protection Act, Public Law 83-566. While the EA conceded that the Irrigation District had maintained the irrigation system since the 1990s, the NRCS involvement in the project was because "funding opportunities are not reasonably certain to occur." Sherlock Decl. Ex. 1 at 1, 9, ECF No. 30.

But the Court agrees with the Federal Defendants that it is unfeasible "for *landowners* in this Irrigation District to themselves *install* this project . . . under alternative cost-sharing assistance." NRCS Resp. 49 (emphasis in original). What is more, there is nothing in the regulation requiring an agency to make formal findings about funding eligibility, as Plaintiffs seem to be alleging here. *See* 7 C.F.R. § 622(a)(6). The Court therefore finds that Plaintiffs are unlikely to prevail on this claim.

### III.   MERITS OF PLAINTIFFS' STATE-LAW CLAIMS

#### A. Private Nuisance

Plaintiffs first argue that construction from the project will constitute a private nuisance, but the Court disagrees. Legal activity by the dominant estate, even if it interferes with or impairs an owner's personal enjoyment, cannot support a private nuisance claim. *Clark v. Kuhn*, 171 Or. App. 29, 33 (2000). Here, and explained below, the Plaintiffs conceded that the Irrigation District's right of way through their property was granted by the federal government over 100 years ago to provide irrigation to farms and ranches. *See* Pl.'s Mot. 39; Act of March 3, 1891, *as amended*, 43 U.S.C. § 946 (the Right of Way Act of 1891); Desert Land (Carey) Act of 1894, 43 U.S.C. § 641. Relatedly, Oregon authorizes irrigation districts to construct irrigation systems to furnish water declared to be a public use. *See* ORS §§ 541.010 – 541.130 (reflecting rights and obligations of Oregon irrigation districts). Plaintiffs have also conceded that Oregon irrigation districts can replace leaky canals and laterals with pipelines. Pl.'s Mot. 28.

Oregon law holds that irrigation districts are "liable for all *damages* done to persons or property of others, *arising from leakage or overflow*. . . ." Or. Rev. Stat. § 541.050 (emphasis added). While Plaintiffs could certainly claim that seepage was harming their property, they cannot argue the inverse that the removal of water seepage entitles them to compensation.

11 – OPINION AND ORDER

Without a water right to the seepage, Plaintiffs' private nuisance claims are unlikely to succeed on the merits.

### B. Right of Way

Plaintiffs next argue that the project violates state easement law. An easement holder must "make only such use of an easement as is reasonably necessary to accomplish the purpose for which the easement is granted . . ." *Clark*, 171 Or. App. at 33. Whether a modification of the easement is reasonably necessary "is a fact-based inquiry . . . determined from the circumstances of each case." *Id.* Modifications may not unreasonably burden the servient estate. *See id.* at 35–36; *see also Swalley Irrigation Dist. v. Alvis*, No. Civ. 04-1721-AA, 2006 WL 508312, *2 (D. Or. Mar. 1, 2006) (providing explanatory parentheticals to three cases and the Restatement (Third) of Property).

Here, the parties agree the Irrigation District was granted its right of way by the Carey Desert Land Act of 1894, 43 U.S.C. § 641. They dispute, however, the purpose for which the easement was granted. The Irrigation District argues that the purpose of the easement was "to provide water to irrigate farms and ranches." Irrigation District's Resp. 7 (citing Pl.'s Mot. 29; Act of March 3, 1891; Desert Land (Carey) Act of 1894, 43 U.S.C. § 641). Plaintiffs argue that the purpose was "[t]o aid the public-land States *in the reclamation of the desert lands therein . . .* ." Pl.'s Mot. 29 (quoting the Carey Desert Land Act) (emphasis in original). The Carey Desert Land Act provides in relevant part:

> To aid the public-land States in the reclamation of the desert lands therein, and the settlement, cultivation and sale thereof in small tracts to actual settlers, the Secretary of the Interior with the approval of the President is, as of August 18, 1894, authorized and empowered, upon proper application of the State to contract and agree, from time to time, with each of the States in which there may be situated desert lands as defined by the Act approved March 3, 1877, and the Act amendatory thereof, approved March 3, 1891, binding the United States to donate,

12 – OPINION AND ORDER

grant, and patent to the State free of cost for survey or price such desert lands, not exceeding one million acres in each State, as the State may cause to be irrigated, reclaimed, occupied, and not less than twenty acres of each one hundred and sixty acre tract cultivated by actual settlers, as thoroughly as is required of citizens who may enter under the desert-land law within ten years from the date of approval by the Secretary of the Interior of the State's application for the segregation of such lands.

43 U.S.C. § 641. Based on a plain reading of the statute, the Court finds that the HDPE piping is reasonably necessary, especially after reviewing Judge Ann Aiken's decision in *Swalley*.

In *Swalley*, an irrigation district sought a declaratory judgment "[to] proceed with [its] proposed irrigation project to convert over five miles of an irrigation canal into a[n irrigation] pipeline." *Swalley*, 2006 WL 508312, at *1. The defendants were "one hundred and sixty property owners who own land adjacent to plaintiff's irrigation right of way." *Id.* The irrigation right of way was granted in 1923 under the Act of March 3, 1891, *as amended*, 43 U.S.C. § 946. That Act provides:

> The right of way through the public lands and reservations of the United States is granted to any canal ditch company, irrigation or drainage district formed **for the purpose of irrigation or drainage**, and duly organized under the laws of any State or Territory … to the extent of the ground occupied by the water of any *reservoir and of any canals and laterals* and may deem necessary for the proper operation and maintenance of said *reservoirs, canals, and laterals*; also the right to take from the public lands adjacent to the line of the canal or ditch, material, earth, and stone necessary for the construction of such canal or ditch: Provided, That … the privilege herein granted shall not be construed to interfere with the control of water for irrigation and other purposes under authority of respective States or Territories.

*Id.* at *2 (emphases added). The *Swalley* defendants argued that the easement "should be limited to the express terms of the Act, and thus [be] limited to irrigation canals and ditches," rather than a buried pipeline. *Id.* The court disagreed. *Id.*

The *Swalley* court instead reasoned that "[w]hile the language of the Act references irrigation canals, ditches and laterals, the Act expressly grants rights of way 'for irrigation

13 – OPINION AND ORDER

purposes' with no restriction on the method used for such purposes." *Id.* Without a restriction, "ordinarily a grantee of an easement is not restricted to the methods of use which were current at the time of the grant, but may reasonably change that use over time as long as the burden on the servient estate is not increased." *Id.* (quoting *Kell v. Oppenlander*, 154 Or. App. 422, 427 (1998)). Put simply, "well-established princip[les] of property law allow modification of uses under an easement, so long as such changes are not contrary to the purpose of the easement and do not increase the burden on the servient property." *Id.* at *4. The court also noted that "Congress subsequently expanded the uses allowed under irrigation rights of way secured by the Act." *Id.* at *3.

The *Swalley* court granted the irrigation district partial summary judgment, ultimately holding that "[the plaintiff] may construct an irrigation pipeline over lands subject to the irrigation right of way" and that "conversion of the canal to a buried pipeline will not unlawfully burden the property rights of defendants who own such lands." *Id.* at *6. In holding that the irrigation pipeline would not exceed the right of way held by the plaintiff, the court noted the plaintiff's representation "that the pipeline will be laid at the bottom of the existing canal and within the fifty foot right of way extending from each side of the canal." *Id.*

Because the Irrigation District's granted easement is to provide water to irrigate farms and ranches, then the project is reasonably necessary to accomplish this goal. As the Irrigation District states, "it is undeniably imperative that [the Irrigation District] improve the efficiency of its system." Irrigation District's Resp. 9. And like the language of the Act of March 3, 1891, the language of the Carey Desert Land Act "does not place restriction on the method used for [the] purposes [of irrigation]." *Swalley*, 2006 WL 508312, at *2. Without a restriction, "ordinarily a grantee of an easement is not restricted to the methods of use which were current at the time of

14 – OPINION AND ORDER

the grant, but may reasonably change that use over time as long as the burden on the servient estate is not increased." *Id.* (quoting *Kell*, 154 Or. App. at 427).

## IV. OTHER FACTORS FOR PRELIMINARY INJUNCTION

### A. Irreparable Harm

Plaintiffs have demonstrated a likelihood of irreparable harm. *See* Pl.'s Mot. 34 ("The Property Owners will immediately lose hundreds of thousands of dollars in the form of decreased property values."). Defendants counter that economic damages here cannot be considered irreparable harm because they may be remedied by a damage award. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). But because of the unquestionable devaluation of their properties and even though Plaintiffs may remedy these through ordinary litigation, the Court finds that Plaintiffs have demonstrated a likelihood of irreparable harm.

### B. Balance of Equities

"To determine which way the balance of the hardships tips, [the Court] must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). The Court weighs each "of the hardships of each party against each other." *Id.* The Property Owners argue harm to their own economic interests. *See* Pl.'s Mot. 36 (stating that Plaintiffs "have no way of protecting their economic interests aside from the current lawsuit"). But the Court agrees with Defendants that Plaintiffs "are attempting to assert a water right that [does not] exist – a right to unintended seepage which allows trees to grow on their private property and boost their property values." NRCS's Resp. 55. And the hardship faced by Defendants is not

15 – OPINION AND ORDER

minimal. If the Court were to issue an injunction, it would delay the project's implementation and frustrate the Irrigation District and Federal Government's desire to "further the conservation and utilization of water, the improvement of water resources, and the quality of the environment." *Id.* at 56 (citing 16 U.S.C. § 1001). As the Court was informed at oral argument, time is of the essence because the project must begin in the winter months while the canals are dry. Thus, the Court finds that the balance of equities tips in Defendants' favor.

### C. The Public Interest

While the Court is sympathetic to Plaintiffs' concern about economic harm they face, the Court should still "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winters*, 555 U.S. at 24 (quotation omitted). The Federal Government and the Oregon Governor's Office jointly support the project. There is also plenty of evidence reflecting that the project will improve water quality and habitats for imperiled species in Central Oregon, which likely explains why no environmental-advocacy group has joined in this litigation. And as mentioned, the project will also eliminate the public safety concerns posed by open canals. In the end, Plaintiffs private interests are outweighed by the community's interest in having a safe and efficient irrigation system in the Deschutes Basin.

### CONCLUSION

For the above reasons, Plaintiffs' Motion for a Preliminary Injunction, ECF No. 28, is DENIED.

IT IS SO ORDERED.

DATED this 13th day of November, 2020.

                                                    _____/s/ Michael McShane_____
                                                    **Michael J. McShane**
                                                  **United States District Judge**